**CAL FED MORTGAGE COMPANY, et al., Appellants,**

v.

**John E.H. STREET, Appellee.**

No. 3–90–227–CV.

Court of Appeals of Texas, Austin.

Dec. 11, 1991.

Rehearing Overruled Jan. 22, 1992.

Thomas C. McGraw, Gibson, Dunn & Crutcher, Dallas, for appellants.

Darrell Gest, Hearne, Knolle, Livingston & Holcomb, Austin, for appellee.

Before POWERS, JONES and SMITH, JJ.

JONES, Justice.

John E.H. Street, appellee, sued Cal Fed Mortgage Company and California Federal Bank, F.S.B. (collectively, "Cal Fed"), appellants, for failing to provide him with promised financing for the acquisition of an office building in Austin, Texas. Street claimed that Cal Fed induced him to purchase the building by promising approval of the requested financing. In his suit, Street alleged fraud, breach of contract, negligent misrepresentations, promissory estoppel, and violations of the Deceptive Trade Practices Act (DTPA), Tex.Bus. &

Com.Code Ann. §§ 17.41–.63 (1987 & Supp. 1991). The jury found in favor of Cal Fed on all theories alleged except the DTPA. The jury found that Cal Fed had violated the DTPA, and on that basis the trial court rendered judgment for Street in the amount of $268,110.95. In the first of its ten points of error on appeal, Cal Fed argues that Street's DTPA claim was barred by limitations. We agree and will reverse and render a take-nothing judgment.

THE DISPUTE

On August 27, 1984, Street and Don Martin signed a contract to purchase an office building in Austin known as Hyridge Place (Hyridge) for a cash price of $3,240,000. Under the contract, closing on the sale was to occur no later than October 22, 1984. In an effort to obtain financing, Street and Martin put together a loan package that contained information about Hyridge and set out the terms of the loan they were seeking: "permanent" financing in the form of a non-recourse note in the amount of $3,770,000.

On September 14, 1984, Street and Martin sent loan packages to various financing sources. A few days afterwards, Street spoke with Allan Dannatt, a representative of Cal Fed in charge of loan production. In the course of this conversation, Street and Dannatt discussed the possibility of Cal Fed's funding a non-recourse loan for the purchase of Hyridge. According to Street, Dannatt told him that he had the authority to make the loan; that the terms of the deal were acceptable; that Cal Fed would make the loan; and that although formal committee approval was necessary, the formal loan-committee was a "rubber stamp" process once the financing requests had gone through him. Dannatt followed up with a letter to Street and Martin that set forth the terms they had discussed.

Between the date of their first discussion and the date of closing on the purchase of Hyridge, Street and Dannatt spoke on several other occasions. According to Street, sometime during the first two weeks of October 1984 he learned that Cal Fed would not be able to fund the loan until

after October 22, the scheduled closing date. Dannatt assured him, however, that Cal Fed would fund the loan after the closing.

Street also testified that he and Dannatt discussed the need for interim financing in order to enable Street to close on Hyridge by October 22. According to Street, during the course of several conversations, Dannatt assured him that the Cal Fed loan needed only formal approval; that he had already informally approved it; and that the loan committee would approve it at the next scheduled meeting on October 23. Based on Dannatt's assurances, Street and Martin obtained interim financing for the purchase of Hyridge from Texas Commerce Bank (TCB). The closing took place on October 22, 1984, at which time Street and Martin signed a $3,373,000 recourse note with TCB and closed their purchase of the building for $3,243,767.42.

The next day, October 23, 1984, Cal Fed informed Street that it would not make the non-recourse loan. Street testified he knew then that Dannatt and Cal Fed had misled and deceived him.

Shortly thereafter, Street bought Martin's interest in Hyridge for $50,000. Through 1985 and 1986, the building produced enough revenue to cover Street's note payments and other expenses, so Street made no complaint to Cal Fed. In January 1987, however, the major tenant of Hyridge vacated the building; as a result, the income from Hyridge became insufficient to make the payments on the TCB loan. Street testified that because he was personally liable on the TCB note, he was forced to make the loan payments out of his own pocket and eventually had to sell Hyridge in the fall of 1988. Although in 1984 Hyridge was appraised as being worth several hundred thousand dollars more than the $3.243 million purchase price, by 1988 the real estate market in Austin had declined so much that Street was able to sell the building for only $1.782 million. Street then paid off the TCB note with the proceeds from the sale plus money from his own pocket. Street filed suit against Cal Fed in March 1988, claiming that but for Cal Fed's misrepresentations he would neither have signed the recourse note to TCB nor purchased Hyridge. He alleged damages in excess of $2.5 million.

## STATUTE OF LIMITATIONS

■ Cal Fed argues in its first point of error that Street's DTPA claim is barred by limitations. A claim under the DTPA is subject to the specific two-year limitations provision contained in the Act:

All actions brought under this subchapter must be commenced *within two years after the date on which the false, misleading, or deceptive act or practice occurred* or within two years after the consumer discovered or in the exercise of reasonable diligence should have discovered the occurrence of the false, misleading, or deceptive act or practice.

Tex.Bus. & Com.Code Ann. § 17.565 (1987) (emphasis added). Cal Fed argues that because all of the conduct that gave rise to Street's DTPA claim occurred on or before October 23, 1984, and because he discovered its occurrence at the same time, Street's suit filed in March 1988 is barred by the two-year limitations period in section 17.-565. Street argues, on the other hand, that his cause of action did not accrue until January 1987 because he did not have to pay any personal out-of-pocket expenses until the revenues from Hyridge dropped. We conclude that limitations bars Street's DTPA claim, for the following reasons.

1. *Section 17.565 of the DTPA*

Section 17.565 provides that an action brought pursuant to the DTPA must be commenced within two years after the date on which "the deceptive act or practice occurred" or within two years after its occurrence was or should have been discovered. It is not disputed that all of Cal Fed's deceptive acts and practices occurred on or before October 23, 1984; nor is it disputed that by that same date, Street knew that those acts and practices had been false and deceptive. Nonetheless, he did not file suit against Cal Fed until March 1988—nearly three-and-one-half years after the latest date on which the

acts and practices occurred and were discovered.

■ In an attempt to circumvent the apparent bar to his claim, Street argues that limitations did not begin to run until he suffered personal out-of-pocket losses in January 1987. We disagree. The clear language of section 17.565 provides that, for all DTPA actions, limitations begins to run from the date of the occurrence or discovery of the deceptive act or practice. If the legislature had intended limitations in DTPA actions to run from the date a consumer suffers damages, that intention could easily have been expressed in specific terms. Indeed, most statutes of limitations require that suit be brought within a specified period of time after the cause of action "accrues." *See, e.g.,* Tex.Civ.Prac. & Rem. Code Ann. §§ 16.002–.006 (1986). In the DTPA, however, the legislature did not use such language, but instead expressly made the limitations period begin to run when the deceptive act or practice *occurred* or when its occurrence was or should have been discovered. *Compare Kimball v. Brothers,* 741 S.W.2d 370 (Tex.1987). We may not ignore the legislature's express language: "It is the duty of courts to construe a law as written, and, if possible, ascertain its intention from the language used therein, and not look for extraneous reasons to be used as a basis for reading into a law an intention not expressed nor intended to be expressed therein." *Government Personnel Mut. Life Ins. Co. v. Wear,* 151 Tex. 454, 251 S.W.2d 525, 529 (1952).

Based on the plain language of section 17.565, we conclude that, as to Street's DTPA claim, limitations began to run on October 23, 1984. Accordingly, his DTPA claim is barred.

### 2. *Legal Injury Rule*

■ Even if section 17.565 were not worded as it is, general Texas case law regarding accrual of a cause of action would mandate the same result in the present circumstances. In dealing with the problem of when a cause of action accrues, the Texas Supreme Court, more than one hundred years ago, formulated what has come to be known as the "legal injury rule":

> When an act is in itself lawful as to the person who bases an action on injuries subsequently accruing from, and consequent upon, the act, it is held that the cause of action does not accrue until the injury is sustained.... If, however, the act of which the injury was the natural sequence was a legal injury,—by which is meant an injury giving cause of action by reason of its being an invasion of a plaintiff's right,—then, be the damage however slight, limitation will run from the time the wrongful act was committed, and will bar an action for any damages resulting from the act, although these may not have been fully developed until within a period less than necessary to complete the bar.

*Houston Water–Works Co. v. Kennedy,* 70 Tex. 233, 8 S.W. 36, 37 (1888).

More than half a century later, in *Quinn v. Press,* 135 Tex. 60, 140 S.W.2d 438 (1940), the supreme court made it clear that a fraudulent misrepresentation constitutes the kind of "legal injury" that commences the running of limitations. In *Quinn* the plaintiff loaned an individual $5,000 in reliance on the debtor's representations that the property pledged as security for the debt was worth $20,000. When the debtor defaulted, the plaintiff's foreclosure on the collateral revealed the falsity of the debtor's representation: after foreclosure, there was still a deficiency of $2,500. The plaintiff sued Quinn for fraud for having represented the pledged properties to be worth more than their true value. The jury found that the plaintiff could, with the exercise of diligence, have discovered that she had been defrauded in 1932; however, she did not file suit until October 14, 1935. Based on the jury's findings, the trial court entered judgment that the plaintiff's cause of action was barred by the two-year statute of limitations.

On appeal the plaintiff in *Quinn* contended that limitations did not begin to run until she had foreclosed on all of the pledged properties, because only then was

it certain that she had suffered any damages at all. Relying on *Houston Water-Works*, the supreme court rejected the plaintiff's argument and held that limitations began to run from the date the plaintiff could have learned that she had been defrauded:

> In such a case [of fraud and deceit] the cause of action accrues at the time the fraud is perpetrated, unless it is concealed or is not known to the injured party....
>
> The rule is not changed ... because the alleged injured party may not with certainty know at the time the fraud is committed, or at the time it is discovered, just how much, *if any*, in dollars and cents [s]he has been damaged. To so hold would create an unauthorized exception to the statutes of limitation, and render the law uncertain in all cases of the nature of the present one. Here the plaintiff waited more than five years after the perpetration of the alleged fraud before bringing her suit, and this she alleged was necessary because she first must have foreclosed her deed of trust against the mortgaged property in order to determine with precision how much she was damaged by the fraudulent representations of the defendant. The fallacy of such a contention is at once apparent, for it will readily be seen that in any similar case of fraud, *it could with as much legal propriety be claimed that a delay of seven, eight, or even ten years must be extended to the defrauded party before the statutes of limitation would be put in operation against his cause of action, with the probable consequence of bringing into the case many conditions and circumstances not directly attributable to the fraud.*

*Quinn*, 140 S.W.2d at 440 (emphasis added).

Street relies on *Atkins v. Crosland*, 417 S.W.2d 150 (Tex.1967), for the proposition that limitations did not begin to run on his DTPA claim until he began experiencing revenue shortfalls on Hyridge in 1987. Street's reliance on *Atkins* is misplaced. In *Atkins*, the supreme court adhered to the legal injury rule, citing *Quinn*, but

held that an accountant's alleged negligence in using an accounting method that was later rejected by the Commissioner of Internal Revenue simply did not constitute a completed wrong: "Thus, the use of the cash method, as opposed to the accrual method, was not in itself the type of unlawful act which, upon its commission, would set the statute in motion." *Atkins*, 417 S.W.2d at 153.

The court in *Atkins* relied heavily on the reasoning in its earlier opinion in *Linkenhoger v. American Fidelity & Casualty Co.*, 152 Tex. 534, 260 S.W.2d 884 (1953), where the court concluded that limitations did not begin to run on a "Stowers" claim until the judgment in the former case became final. *Linkenhoger*, however, is merely another example where the defendant's particular negligent act was held not to constitute, in and of itself, a completed wrong or legal injury. Indeed, in *Linkenhoger* the court expressly distinguished *Quinn* on the ground that *Quinn* involved acts of fraud:

> In the Quinn case ... the suit was one for fraud based on false representations as to the value of certain property. The falsity vel non of the representations was a fact that could have been presently ascertained. The court merely held that the cause of action accrued at the time the fraud is perpetrated even though "the alleged injured party may not with certainty know at the time the fraud is committed, or at the time it is discovered, just how much, if any, in dollars and cents he has been damaged." No fraud has been perpetrated, however, until the plaintiff has acted in reliance upon false representations.

*Linkenhoger*, 260 S.W.2d at 886.

In the present case, Street bases his DTPA cause of action on alleged misrepresentations made by Cal Fed and relied on by Street in October 1984. Here, as in *Quinn*, it could easily have been five, ten, or fifteen years before some event or set of circumstances caused the cash flow from Hyridge to decrease to a point where Street would suffer measurable losses. Street knew, however, that he had been

misled and deceived the day Cal Fed refused to fund the non-recourse loan for the purchase of Hyridge. Should he then be allowed to wait an indefinite number of years to sue for losses that might—or might not—ever occur, in effect giving him a permanent guarantee against all possible adverse conditions and circumstances that could cause his investment to lose money? Based on our reading of section 17.565 and the cases discussed above, we think such a result would be contrary to the purpose of limitations statutes:

> Limitations statutes afford plaintiffs what the legislature deems a reasonable time to present their claims and protect defendants and the courts from having to deal with cases in which the search for truth may be seriously impaired by the loss of evidence, whether by death or disappearance of witnesses, fading memories, disappearance of documents or otherwise. The purpose of a statute of limitations is to establish a point of repose and to terminate stale claims.

*Murray v. San Jacinto Agency, Inc.*, 800 S.W.2d 826, 828 (Tex.1990).

Although Street's DTPA cause of action for misrepresentation is not, strictly speaking, a claim for fraud, we believe it is similar enough to warrant the same treatment for purposes of the commencement of the running of limitations. On October 23, 1984, Street learned that Cal Fed's representations had been false; he had already relied on those representations when he signed the TCB note and purchased Hyridge on October 22. Thus, were it necessary to our decision here, we would hold that on October 23 Street had sustained a "legal injury," and Cal Fed had committed a "completed wrong," sufficient to start the statute of limitations running. *Cf. Woods v. William M. Mercer, Inc.*, 769 S.W.2d 515, 517 (Tex.1988); *Zidell v. Bird*, 692 S.W.2d 550 (Tex.App.1985, no writ); *Blondeau v. Sommer*, 139 S.W.2d 223 (Tex.Civ.App.1940, writ ref'd); *American Indem. Co. v. Ernst & Ernst*, 106 S.W.2d 763 (Tex.Civ.App.1937, writ ref'd).

### 3. *Actual Damages*

■ Finally, even if limitations did not begin to run until Street suffered some measurable damages, we conclude that as a matter of law he suffered actual damages beginning at least as early as 1985, despite the jury finding to the contrary. Street testified at trial that the interest rate on the TCB loan was higher than the interest rate he would have had to pay on the loan from Cal Fed. Plaintiff's exhibit 30 shows that interest payments were made to TCB beginning in March 1985. The excess amount of interest that Street was compelled to pay in borrowing the funds from TCB constituted damages for which he could have sued at least as early as March 1985. Indeed, Street included these interest payments as an element of his requested damages in a damage summary submitted to the jury in plaintiff's exhibit 31. We conclude that the evidence shows conclusively that Street had suffered actual damages by March 1985 at the latest.[1] Thus, were it necessary to our decision here, we would, on this additional basis, hold that Street's cause of action is barred by limitations.

We sustain Cal Fed's first point of error; as a result, we do not address points of error two through nine.

### GROUNDLESSNESS

■ In its tenth point of error, Cal Fed urges this Court to hold, as a matter of law, that Street's suit was groundless and brought in bad faith, or brought for the purpose of harassment, and requests that we award Cal Fed its attorney's fees under section 17.50(c) of the DTPA. *See* Tex. Bus. & Com.Code Ann. § 17.50(c) (1987). After reviewing the entire record, we decline to so hold. *See Donwerth v. Preston II Chrysler–Dodge*, 775 S.W.2d 634, 636–38 (Tex.1989). Point of error ten is overruled.

### CONCLUSION

For the foregoing reasons, we conclude that Street's DTPA claim was, as a matter

---

1. In light of this holding as to interest payments, we do not address the question whether Street's being forced to remain on the TCB *recourse* note—instead of being able to replace it with the promised *non-recourse* loan from Cal Fed—constituted actual damage in and of itself.

of law, barred by limitations; we sustain Cal Fed's first point of error. The judgment of the trial court is reversed, and we here render judgment that Street take nothing by his suit.