**Alton D. HOLMES, Appellant,**

v.

**P.K. PIPE & TUBING, INC., Appellee.**

**No. 01–91–00264–CV.**

Court of Appeals of Texas,
Houston (1st Dist.).

May 20, 1993.

Barbara Parsons, Houston, for appellant.

J. Mark Breeding, Houston, for appellee.

Before DUGGAN, O'CONNOR and HEDGES, JJ.

## OPINION

DUGGAN, Justice.

This appeal arises from a landlord-tenant dispute. Defendant-appellant, Alton D. Holmes, appeals a $61,004.64 award in favor of plaintiff-appellee, P.K. Pipe & Tubing, Inc. (P.K. Pipe). We affirm in part and reverse and render in part.

### Factual background

On December 11, 1981, defendant purchased a 48.4395–acre tract of land in Montgomery County from Cecil and J. Nadine Henkel. A portion of this tract contained a waste disposal site known as the Charlie Burch Pits. A prior owner of the property, Rohm and Haas Texas Incorporated (Rohm and Haas), operated the site during the 1960's, and used it as a disposal area for methyl metharcrylate tar residue. Defendant knew before he purchased the property that there was chemical waste on the site. He also knew that an entity named Associated Properties had purchased the property from Dr. Henkel but later had sued Dr. Henkel, alleging that he committed fraud by not informing them of the waste. As part of the settlement, Dr. Henkel purchased the property back from Associated Properties.

In January 1983, the Texas Department of Water Resources mandated a clean-up and approved a waste disposal closure plan for the site. The closure plan was incorpo-

rated into a compliance agreement, which was signed by all interested parties, including defendant. The compliance agreement included a provision requiring defendant "to record on his deed records the location of the wastes...." Defendant signed the compliance agreement on March 8, 1983.

Under the closure plan, a landfill cell was created on defendant's property. Waste materials from the Charlie Burch Pits as well as from adjacent property were placed in the cell. After the waste was placed in the cell, it was capped with six inches of clean, compacted clay. Final cover was placed over the entire disposal area; erosion protection, leachate control, and waste seepage control measures were designed into the cover system. Groundwater monitor wells were installed on the property. The closure plan mandated restricting access to the property with a chained and locked gate, and required the posting of signs at 200-foot intervals along the perimeter fence. The signs were to contain the following message:

Contaminated Area

Keep Out

Texas Department of Water Resources

479–5981

The plan further required a one-year, post-closure monitoring period. Rohm and Haas undertook clean-up of the site, pursuant to the closure plan. Defendant did not participate in the actual clean-up.

In 1985, defendant sold approximately 30 acres of the property, and retained approximately 17 acres. The waste disposal site was located on the property retained by defendant.

In June 1984, Eulyss Rachal, a right-of-way agent for Tennessee Gas Pipeline Company (Tenneco), contacted defendant about leasing the 17–acre site as a pipe storage yard. Rachal testified that he saw no warning signs on the property and that defendant never told him chemical waste was buried on the site or showed him a copy of the closure plan or the compliance agreement. He further testified that he never would have leased defendant's prop-erty if he had known about the buried waste. Defendant testified, however, that he met Rachal at the site, told him about the buried waste, and showed him the compliance agreement.

Defendant agreed to lease his property to Tenneco for a three-month term. At approximately noon on June 12, 1984, Rachal wrote and handed defendant a check for the lease payments. Later that day, at 3:12 p.m., defendant filed a notice in the deed records of Montgomery County that chemical waste was buried on a 3.3677–acre tract on his property. Defendant had not heretofore fulfilled the 1983 compliance agreement requirement that he record notice of the waste site.

In October 1984, Tenneco sought to sell pipe located on defendant's property and at four other sites. The pipe was eventually purchased by P.K. Pipe and its joint venture partners, the Proler International Corporation (Proler Corp.), Grover Scruggs & Sons, and D & T Pipe. Proler Corp. handled the accounting for the joint venture.

Grover Scruggs and Pete Knowles, owner of P.K. Pipe, inspected defendant's property and contacted defendant about leasing the property for continued storage of the pipe. Defendant met Scruggs and Knowles at the property. Defendant testified that when he met them there, he saw pipe stacked on the waste disposal site and told the two men about the waste buried beneath the pipe. He also testified that he showed them several of the groundwater monitor wells and explained the wells' purpose. He testified that he did not show them the closure plan or the compliance agreement. Knowles and Scruggs both testified that defendant never mentioned the buried waste. They testified that defendant pointed out several wells, and asked them not to block access to the wells; he did not, they testified, explain the purpose of the wells. Both men further testified that they never would have leased the property if they had known about the buried waste.

Knowles and Scruggs orally agreed with defendant to lease the property. At the

time of the oral agreement, there was approximately 100,000 feet of pipe located on the property, atop the waste disposal site. The joint venture participants subsequently moved another 100,000 feet of pipe to the property, although not on top of the waste site.

Defendant prepared the lease, dated it December 1, 1984, and mailed it to Knowles on November 19, 1984. The lease designated P.K. Pipe as lessee, provided for a one-year term with 12 monthly rental payments of $750 each, and contained an option for P.K. Pipe to renew the lease for a one-year term at $1,000 a month.

The lease also contained the following provisions:

## II

The premises shall be used by Lessee as a space for the storing of pipe, casing, pipe line materials, machinery, equipment, appliances, and other personal property belonging to Lessee ...; and upon termination of this lease or any extension thereof, Lessee shall remove all personal property stored upon the premises.

## III

Lessee shall at its own cost and expense comply with all of the requirements of all municipal, state and federal authorities now in force, or which may hereafter be in force, pertaining to the said premises....

## V

Lessee covenants and agrees not to conduct any digging, excavation or drilling operations in and upon said premises, or to damage any of the water wells located on the premises. Lessee covenants and agrees to keep the gate at the entrance to the premises locked.

## VI

Lessee covenants and agrees to restore the premises to substantially the same condition as said premises were in prior to the storing of the pipe, casing, machinery and equipment thereon.

## VIII

Lessor covenants and agrees that the Lessee, on paying the rent, and on keeping[,] observing and performing all the other terms, covenants, conditions and provisions and agreements herein contained on the part of the Lessee to be kept, observed, and performed, shall during the said term hereby granted, peaceably and quietly have, hold and enjoy the said premises for the full term of this lease, subject to the terms, covenants, conditions, provisions and agreements hereof.

Knowles signed and returned the lease to defendant.

Several weeks later, defendant received a copy of a letter from Larry Feldcamp, attorney for Rohm and Haas, to the Texas Department of Water Resources. The letter, dated December 12, 1984, advised the agency that pipe was being stored on top of the waste site. Feldcamp stated, in part, "[I]t is estimated that there are approximately 3,500 sections of pipe which are from 30 to 40 feet in length. The total estimated weight of the pipe is 7,000,000 pounds. As you know[,] the cap for this site was not designed to support that kind of weight." Feldcamp further stated that, according to his experts, "failure to remove the pipe will probably cause the waste to ooze through the surface cap or into the drainage ditch." The letter expressed Feldcamp's opinion that defendant was solely responsible for the activities on the site; he recommended that the agency "take prompt action against Mr. Holmes to correct the present disturbance of the cap and prevent any further activities on the property which would result in the release of the waste to the surface or drainage ditch or cause contamination of the groundwater."

Defendant discussed the Feldcamp letter with Knowles, and on December 17, 1984, he sent Knowles a copy of the letter. Defendant's transmittal letter to Knowles states, in part, "I will keep you advised of

any further developments concerning the complaint in the above letter and ask that you please keep me advised."

In March 1985, the joint venture participants hired Clair Carden, an environmental engineer, to inspect the site and to review relevant regulations and correspondence. In the course of his investigation, Carden obtained and reviewed copies of the closure plan and compliance agreement. Although Carden prepared a report for the joint venture, he did not testify about the contents of his report or about any recommendations he made to the joint venture.

On May 9, 1985, Feldcamp again wrote to the Texas Department of Water Resources and sent a copy of this letter to Knowles. Feldcamp's second letter concerned the lack of warning signs at the site, and the fact that the site was readily accessible to area children. The letter stated that the owner and/or lessee of the site should properly maintain the site in accordance with the requirements of the closure plan and compliance agreement: "These obligations include maintaining the integrity of the site, including the cap, the fence around the site and the signs at the site." Feldcamp again asked the agency to take action to insure the obligations were being met.

On November 7, 1985, Knowles wrote to defendant, informing him of P.K. Pipe's desire to extend the lease for a one-year period beginning December 1, 1985. Knowles' letter stated, in part, "I feel it is only fair to notify you once again that we are still having problems with Roman [sic] Haas and the Texas Water Control Department [sic]. We have very little knowledge, if any, concerning this and desire to take every effort not to become involved."

In May and September 1986, Susan Ripley, an investigator for the Texas Water Commission (the successor agency of the Texas Department of Water Resources) investigated defendant's property. On December 12, 1986, the agency wrote to defendant. The letter included a copy of Ripley's report, in which she noted that the soil cover constructed over the disposal site had been damaged by heavy equipment driven across the cover and the storage of pipe on top of the cover. Ripley recommended: "The site should be returned to the original closed condition to prevent the possibility of seepage of wastes or waste constituents." The letter instructed defendant, as owner of the site, to repair the cover and to insure that his lessee ceased all operations that would damage the cover.

On December 18, 1986, defendant sent a copy of the Texas Water Commission's letter to Knowles. Defendant's accompanying letter directed Knowles to "[p]lease comply with the requirements in the above letter and furnish me evidence of compliance."

The joint venture participants again hired environmental engineer Carden to act as liaison with the Texas Water Commission. Carden met with Ripley, who advised him that the pipe had to be removed from the site. In December 1986, the joint venture participants began removing all their pipe from defendant's property. When the pipe was removed, the joint venture participants restored the waste disposal site to its post-closure condition. On February 20, 1987, Knowles, by letter, terminated P.K. Pipe's lease with defendant. In his letter, Knowles stated:

Mr. Holmes, we were not told in the beginning, or at the time we entered into a lease with you, that the property we were leasing was a hazardous landfill. We have removed the pipe from your property at a cost in excess of $100,000, which was created by our not being forewarned of the potential problems of stacking pipe in a hazardous landfill and the potential problems with the Texas Water Control Department [sic].

Over and above this particular cost you recognize that it was our intent to work our pipe on your property and sell from the same. This would have reduced our cost of movement, cost of operation and potential problems with the Texas Water Control Dept. [sic] by a large sum of money.

P.K. Pipe filed suit on November 12, 1987, alleging breach of the lease agreement, misrepresentation, and violation of

the Deceptive Trade Practices–Consumer Protection Act (DTPA)[1]. All three causes of action are premised upon defendant's alleged failure to inform the joint venture of the existence of chemical waste underneath the pipe acquired by the joint venture from Tenneco. Following a bench trial, the trial court rendered judgment in favor of P.K. Pipe for $61,004.64.

Defendant appealed, alleging, among other things, that the trial court erred in failing to file findings of fact and conclusions of law. This Court remanded the case to the trial court for entry of findings of fact and conclusions of law, which were filed on August 7, 1992.

In its findings of fact and conclusions of law, the trial judge noted that the damages award included compensatory damages of $57,805.33 and exemplary damages of $3,199.31. The trial court awarded exemplary damages "[b]ecause Holmes acted knowingly in violating the DTPA and acted with malice in defrauding P.K. Pipe...."

### Standard of review

In five points of error, defendant challenges the trial court's findings of fact and conclusions of law. Specifically, defendant argues that: (1) P.K. Pipe's DTPA cause of action was barred by limitations; (2) there is no evidence or insufficient evidence to support a finding that defendant breached the lease, committed fraud or misrepresentation, or caused P.K. Pipe's damages; and (3) there is no evidence or insufficient evidence to support the amount of damages awarded.

■ In an appeal from a bench trial, findings of fact have the same weight as a jury's verdict upon special issues. *Spiller v. Woodard*, 809 S.W.2d 624, 627 (Tex. App.—Houston [1st Dist.] 1991, no writ). Defendant's brief raises both "no evidence" and "factual insufficiency" evidence points of error.

■ In reviewing a "no evidence" point, we will consider only the evidence and reasonable inferences from the evidence that tend to support the finding, and

we must disregard all evidence and inferences to the contrary. *Southwestern Bell Media, Inc. v. Lyles*, 825 S.W.2d 488, 493 (Tex.App.—Houston [1st Dist.] 1992, writ denied). In reviewing a "factual insufficiency" point, we are required to consider the evidence in support of and contrary to the challenged finding. We may set aside the finding only if the evidence is so weak or the finding is so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. *Id.*

■ Findings of fact are not conclusive on appeal when, as in this case, a statement of facts appears in the record. *Spiller*, 809 S.W.2d at 627. The findings of fact are binding on this Court only if they are supported by evidence of probative force. *Id.* Although a trial court's conclusions of law may not be challenged for factual insufficiency, the trial court's conclusions drawn from the facts may be reviewed to determine their correctness. *Id.*

### Limitations

In his first point of error, defendant argues that the trial court erred as a matter of law in finding that P.K. Pipe's DTPA cause of action was not barred by limitations. P.K. Pipe argues, however, that defendant waived his limitations defense.

Defendant first raised his limitations defense in his motion for summary judgment. In its response to defendant's motion for summary judgment, P.K. Pipe argued that because defendant's pleadings did not raise the affirmative defense of limitations, the defense was waived. On June 5, 1990, six days before the summary judgment hearing, defendant filed his first supplemental answer, in which he alleged P.K. Pipe's DTPA cause of action was barred by limitations. Defendant's motion for summary judgment was denied.

P.K. Pipe argues that "[t]he motion for summary judgment failed to preserve Holmes' limitations claim as no pleading of limitations was on file more than seven days prior to the summary judgment hear-

---

1. Tex.Bus. & Com.Code Ann. § 17.41 et seq. (Vernon 1987).

ing as required by Rule 63, Tᴇx.R.Cɪv.P." This argument is without merit. *See Goswami v. Metropolitan Sav. & Loan Ass'n,* 751 S.W.2d 487, 490 (Tex.1988).

■ P.K. Pipe further argues that defendant failed to preserve his limitations defense during trial because he made no objections to evidence concerning alleged misrepresentations or damages that occurred more than two years prior to P.K. Pipe's suit and failed to raise his limitations defense in a motion for judgment during trial. Defendant did, however, raise the defense of limitations in his motion for new trial. After his motion for new trial and pursuant to an order from this Court, the trial court issued findings of fact and conclusions of law, specifically finding that P.K. Pipe's DTPA cause of action was not barred by limitations. Defendant therefore obtained a ruling on his limitations defense, as required by Tᴇx.R.Aᴘᴘ.P. 52(a). We find that defendant did not waive his limitations defense. *See Edlund v. Bounds,* 842 S.W.2d 719, 728 (Tex.App.—Dallas 1992, writ denied).

■ Defendant argues that the trial court erred as a matter of law in finding that P.K. Pipe's DTPA claim was not barred by limitations because P.K. Pipe knew of defendant's alleged misrepresentation in December 1984, when Knowles received a copy of Feldcamp's December 12, 1984, letter to the Texas Department of Water Resources. P.K. Pipe acknowledges that it learned of defendant's misrepresentation when it received the Feldcamp letter on or about December 19, 1984. However, P.K. Pipe argues that it did not discover that it would incur monetary damages as a result of the misrepresentation until defendant sent Knowles a copy of the December 12, 1986, letter from the Texas Water Commission and ordered P.K. Pipe to comply with the agency's requirements.

The trial court made the following findings of fact:

79. P.K. Pipe filed its original petition against Alton Holmes on November 12, 1987.

80. P.K. Pipe first learned of Holmes' misrepresentation on or about December 19, 1984, when it received from Holmes a copy of a letter dated December 12, 1984[,] from Feldcamp to the Texas Department of Water Resources.

81. P.K. Pipe did not become aware that it would suffer monetary damages from Holmes' breach of lease agreement, Holmes' misrepresentations and nondisclosures, and Holmes' deceptive acts until it received the December 12, 1986 letter from the Texas Water Commission.

The trial court made the following conclusion of law:

13. P.K. Pipe is not barred from recovering for Holmes' DTPA cause of action because P.K. Pipe was unaware that it would incur money damages until December 12, 1986, less than a year prior to suit being filed.

We agree with defendant that P.K. Pipe's DTPA cause of action was barred by limitations. The statute provides, "All actions brought under this subchapter must be commenced within two years after the date on which the false, misleading, or deceptive act or practice occurred or within two years after the consumer discovered or in the exercise of reasonable diligence should have discovered the occurrence of the false, misleading, or deceptive act or practice." Tᴇx.Bᴜs. & Cᴏᴍ.Cᴏᴅᴇ Aɴɴ. § 17.-565 (Vernon 1987). The statute thus provides that the limitations period begins to run when the deceptive act or practice occurs or, if the deception is concealed, when the consumer, in the exercise of reasonable diligence, should have discovered the *occurrence* of the misrepresentation that is the basis of the complaint. *Southwestern Bell Media, Inc.,* 825 S.W.2d at 492; *Cal Fed Mortgage Co. v. Street,* 824 S.W.2d 622, 623 (Tex.App.—Austin 1991, writ denied). The statute does not provide that the limitations period begins to run when the consumer incurs, or learns that it will incur, damages as a result of the misrepresentation. *Cal Fed Mortgage Co.,* 824 S.W.2d at 625 (if the legislature had intended limitations in DTPA actions to run from the date a consumer suffers damages, that intention could have been expressed in specific terms).

The trial court specifically found (and P.K. Pipe agrees) that P.K. Pipe first learned of the misrepresentation that is the basis of its complaint on or about December 19, 1984. Based on the plain language of section 17.565, it is clear that, with respect to P.K. Pipe's DTPA claim, limitations began to run on that date. P.K. Pipe filed its original petition against defendant on November 12, 1987, almost three years after its DTPA cause of action accrued. We hold that the trial court erred in concluding that P.K. Pipe's DTPA claim was not barred by limitations. Accordingly, we sustain defendant's first point of error.

#### Breach of lease

In his second point of error, defendant alleges that there was no evidence or insufficient evidence to support the trial court's finding that he breached the lease. Specifically, defendant challenges the following findings of fact:

48. Holmes knew at the time he executed the lease agreement that buried chemical waste made the site unsuitable for the storage of pipe.

50. Holmes deliberately misled representatives of P.K. Pipe about the nature of the property, and its suitability for the storage of pipe.

51. Holmes intended to induce both Tenneco and P.K. Pipe to enter their respective leases by deliberately failing to disclose the presence of chemical waste on the property.

52. The presence of chemical waste at the site rendered the leased premises unsuitable for the purpose of pipe and equipment storage, and materially interfered with P.K. Pipe's peaceable and quiet enjoyment of the premises.

53. Upon receiving notification from the Texas Water Commission, Holmes did not assume the task of remediating his contaminated property, but rather assigned this responsibility to P.K. Pipe in interference with the warranty of peaceable and quiet enjoyment of the premises.

54. The presence of waste at the site prevented P.K. Pipe from working the pipe and from moving pipe freely onto and off of the property as contemplated by the express terms of the lease.

55. Due to the presence of chemical waste and the unsuitability of the site for storage of pipe, P.K. Pipe had to remove all its pipe from the property.

56. The unsuitability of the leased premises for the express purpose of storage of pipe was a breach of the lease agreement which was the direct and proximate cause of monetary damages suffered by P.K. Pipe.

Defendant directs his argument to the trial court's conclusions of law that he breached both the lease's implied warranty of fitness and its express warranty of peaceable enjoyment.

#### A. Implied warranty of suitability

Defendant argues that P.K. Pipe's breach of the implied warranty of suitability claim is barred by limitations. P.K. Pipe disagrees, arguing that defendant had sufficient notice of this claim from facts pled in its original petition. Neither party offers any authority in support of their respective positions. Although these arguments are not adequately briefed, we have nonetheless examined the merits of each party's assertion. We agree with defendant that P.K. Pipe's cause of action for breach of implied warranty of suitability is barred by limitations.

■ P.K. Pipe did not specifically plead breach of implied warranty of suitability as a cause of action separate from its DTPA claim; indeed, P.K. Pipe never *specifically* pled a cause of action for breach of implied warranty of suitability at all. P.K. Pipe's original petition contains three causes of action: (1) breach of the lease agreement based on defendant's failure to provide P.K. Pipe with "peaceable and quiet possession" of the property; (2) failure to disclose information concerning the waste disposal site; and (3) violation of the DTPA. The original petition does not address breach of warranty under its DTPA cause of action. At trial, P.K. Pipe moved for, and was granted, a trial amendment in which P.K. Pipe's trial counsel pled the specific provi-

sions of the DTPA upon which P.K. Pipe relied. Included in these provisions was "Section A–2, breach of an express or implied warranty. . . ." This brief inclusion in the trial amendment was P.K. Pipe's sole reference to an implied warranty of any sort. Thus, P.K. Pipe pled breach of *implied* warranty solely under the DTPA, although it pled breach of the express warranty of peaceable and quiet enjoyment as a cause of action separate from the DTPA.

Because section 17.565 applies to *"[a]ll actions* brought under this subchapter," we find that it must necessarily apply to the cause of action for breach of an implied warranty first raised by P.K. Pipe in its trial amendment. *See McAdams v. Capital Products Corp.*, 810 S.W.2d 290, 292–93 (Tex.App.—Fort Worth 1991, writ denied) (section 17.565 is the appropriate statute of limitations applicable to breach of warranty cause of action brought under the DTPA); *Diamond v. Meacham*, 699 S.W.2d 950, 954 (Tex.App.—El Paso 1985, writ ref'd n.r.e.); *see also Walker v. Sears, Roebuck & Co.* 853 F.2d 355, 362–63 (5th Cir.1988) (because it was pled separately from plaintiff's DTPA cause of action, implied warranty cause of action was not subject to two-year DTPA statute of limitations). It was therefore error for the trial court to find that P.K. Pipe's cause of action for breach of the implied warranty of suitability was not barred by the DTPA's two-year statute of limitations.

**B. Express warranty of peaceable and quiet enjoyment**

 As indicated above, P.K. Pipe's cause of action for breach of the express warranty of peaceable and quiet enjoyment was pled as an independent cause of action and is thus not barred by the DTPA's two-year statute of limitations. A breach of the covenant of quiet enjoyment requires an eviction, actual or constructive, brought about by the acts of the landlord, those acting for the landlord, or those acting with the landlord's permission. *Richker v. Georgandis*, 323 S.W.2d 90, 95 (Tex.Civ. App.—Houston 1959, writ ref'd n.r.e.). The essential elements of constructive eviction are: (1) an intention on the part of the landlord that the tenant shall no longer enjoy the premises; (2) a material act by the landlord that substantially interferes with the tenant's intended use and enjoyment of the premises; (3) the act permanently deprives the tenant of the use and enjoyment of the premises; and (4) the tenant abandons the premises within a reasonable time after the commission of the act. *Fidelity Mut. Life Ins. Co. v. Kaminsky*, 768 S.W.2d 818, 819 (Tex.App.—Houston [14th Dist.] 1989, no writ). The landlord's intent may be inferred from the circumstances. *Coleman v. Rotana, Inc.*, 778 S.W.2d 867, 872 (Tex.App.—Dallas 1989, writ denied).

 We do not agree with P.K. Pipe that it was constructively evicted. It is clear that a material act by defendant (his silence concerning the existence of the waste disposal site) deprived P.K. Pipe of use and enjoyment of a *portion* of the premises—the 3.35–acre waste disposal site. Assuming without deciding that defendant's misrepresentation permanently deprived P.K. Pipe of use and enjoyment of the entire leased tract, we find that P.K. Pipe did not abandon the premises within a reasonable time after discovery of the misrepresentation.

P.K. Pipe asserts that "P.K. Pipe simultaneously learned that there was chemical waste on the leased premises and that operating heavy equipment on the property could cause further damage to the cap covering the waste." P.K. Pipe learned of defendant's misrepresentation on or about December 19, 1984, when Knowles received a copy of Feldcamp's December 12, 1984, letter to the Texas Department of Water Resources. In his letter, Feldcamp noted that approximately 7,000,000 pounds of pipe were stored on the site and stated that the cap on the site was not designed to support that amount of weight. He further stated that the pipe should be removed and the cap should be returned to its postclosure condition. The letter says nothing about operating heavy equipment on the site. The letter does state that *prompt* action should be taken to remove the pipe.

It is uncontroverted that P.K. Pipe did not promptly remove the pipe; indeed, in November 1985, it extended its lease with defendant for another year. P.K. Pipe asserts, "P.K. Pipe had no choice but to leave the pipe on the leased premises until the Texas Water Commission instructed P.K. Pipe on the proper manner of removal of the pipe." P.K. Pipe relies on the testimony of Knowles, Scruggs, and Charles Jewett, vice-president of joint venture participant Proler Corp., but their testimony does not support this contention.

Knowles testified as follows:

Q. Okay. Why did you, when you knew that there was a chemical waste problem because you received this letter [from Feldcamp] in December of '84, why did you extend the lease another year?

A. This was discussed among the group of four that had the 100 percent interest in it and it was discussed—we were trying to figure out what our problems were and [what] the best action was to take. And we decided that as long as we, you know, had been living like we were living, that it probably was the best thing to do just to stay there and not do any additional work.

. . . .

Q. Did you know in 1985 what the Texas Water Commission or the Texas Department of Water Resources was going to require you all to do on getting that pipe off the land?

A. No, sir.

Q. Okay.

A. *I had received some phone calls, but not from the Texas Water Commission.*

(Emphasis added.) Scruggs testified as follows:

Q. Okay. Why did you all decide to go ahead and extend the lease for another one-year term when you knew there was chemical waste on the property?

A. At that point in time, we did not know what would be required of us by [the] Texas Water [Commission] to correct the problem. And so we had not touched any of the pipe that was on the cap and we hadn't put any on there.

When we were notified of it, we stayed completely away from that cap with our stuff. Until they could tell us what they wanted done, we just had to take a wait-and-see attitude.

Q. Okay. Did you ever have any communications directly with the Texas Water Commission?

A. No, sir.

Q. Who of your partners took care of that?

A. Charlie Jewett took care of that.

Jewett testified as follows:

Q. Okay. During this time frame when [Texas Water Commission investigator] Ms. Ripley was making her report [dated October 27, 1986], were you in communication with her?

A. Yes, I was.

Q. Okay. The last paragraph of that report … states, "It is recommended that the owner of the land be contacted in order to discuss with him the problems outlined above. The site should be returned to the original closed condition to prevent the possibility of seepage of wastes or waste constituents."

A. Correct.

Q. Did Mrs. Ripley advise you that it was her opinion that the site should be returned to its original state?

A. Yes, she did.

Q. Do you recall whether she advised you of that during that October [1986] time frame?

A. Yes, she did.

Q. Upon being advised by the Texas Water Commission that the pipe had to be removed, what did the joint venture determine to do?

A. Well, then we had a clear determination of what we had to do, which was to move our material off the site and restore it to a proper condition.

Although all three men testified that they extended the lease because they did not know what the Texas Water Commission would require of them, there is no evidence to indicate that in November 1985 they had reason to believe the agency would require specific pipe removal proce-

dures. Jewett was designated as the joint venture's liaison with the Texas Water Commission. However, he testified that the only agency representative with whom he met was investigator Susan Ripley. He further testified that the first time he met or spoke with her was in September 1986.

P.K. Pipe learned in December 1984 that some of its pipe was located on a chemical waste disposal site and that the cap of that site was not designed to support the weight of the pipe. It did not commence removal of the pipe until early 1987. We find that there was no evidence to support the trial court's finding that "P.K. Pipe was forced to extend the lease due to uncertainty concerning the Texas Department of Water Resource's requirements for removing the pipe." There was no evidence to indicate that P.K. Pipe abandoned the premises within a reasonable time after the commission of defendant's misrepresentation. Consequently, P.K. Pipe was not constructively evicted. In the absence of constructive eviction, there can be no breach of the covenant of quiet enjoyment. Defendant's second point of error is sustained.

### Fraud and misrepresentation

In his third point of error, defendant argues that there is no evidence or insufficient evidence to support the following findings of fact made by the trial court:

59. Holmes knew before he leased his land to Tenneco and to P.K. Pipe that it contained chemical waste, rendering it unsuitable for the storage of pipe and heavy equipment.

61. The existence of chemical waste on Holmes' property was a material fact which a reasonable person would have disclosed to P.K. Pipe and Tenneco prior to executing a lease on the property.

62. Because of his knowledge of a prior lawsuit involving a fraudulent transfer of the same property, Holmes knew he had a duty to disclose the presence of chemical waste on the property.

63. Holmes deliberately withheld information concerning the presence of chemical waste on the leased premises from P.K. Pipe and Tenneco and deliberately misrepresented the suitability of the property for pipe and equipment storage in order to induce P.K. Pipe and Tenneco into leasing this property.

64. Holmes misrepresented the suitability of the property for pipe storage purposes and failed to disclose the presence of chemical waste on the property with the intention that both P.K. Pipe and Tenneco would rely upon the misrepresentation and non-disclosure when they executed their respective leases.

65. P.K. Pipe relied upon Holmes' misrepresentations and willful nondisclosures to its detriment when it entered into the lease agreement with Holmes and placed additional pipe on the property.

66. Holmes knowingly, willfully and maliciously failed to disclose the existence of chemical waste on the leased premises.

67. Holmes acted with conscious indifference to the rights and safety of others by failing to disclose the existence of chemical waste on the leased premises.

68. P.K. Pipe suffered monetary injuries as a direct and proximate result of Holmes' misrepresentations and nondisclosures.

Defendant also asserts that the trial court's failure to find that P.K. Pipe had actual or constructive knowledge of the existence of the chemical waste was against the great weight and preponderance of the evidence.

 The elements of actionable fraud are that: (1) a material representation was made; (2) the representation was false; (3) when the representation was made the speaker knew it was false or made it recklessly without any knowledge of its truth and as a positive assertion; (4) the speaker made the representation with the intent that it should be acted upon by the party; (5) the party acted in reliance upon the representation; and (6) the party thereby suffered injury. *Eagle Properties, Ltd., v. Scharbauer*, 807 S.W.2d 714, 723 (Tex.1990); *Haney v. Purcell Co.*, 796 S.W.2d 782, 785 (Tex.App.—Houston [1st Dist.] 1990, writ denied). When the partic-

ular circumstances impose upon a person a duty to speak and he deliberately remains silent, his silence is equivalent to a false representation. *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 435 (Tex.1986).

Defendant predicates his entire argument under this point of error upon his contention that P.K. Pipe had actual or constructive notice of the existence of the chemical waste site. He argues that P.K. Pipe failed to meet its burden of proof on the element of detrimental reliance; he does not challenge P.K. Pipe's proof on the other elements of fraud.

■ Defendant argues, first, that P.K. Pipe had actual or constructive notice because "[n]otice that the leased property contained a waste disposal site was filed and recorded in the real property records [of Montgomery County] on June 12, 1984," more than five months prior to the lease negotiations between P.K. Pipe and defendant. Defendant asserts that P.K. Pipe should be charged with "constructive notice of the actual knowledge which could have been acquired by examining public records." We disagree.

The supreme court has held that imputed notice under the real property recording statutes is not a defense to a fraud action. *Ojeda de Toca v. Wise*, 748 S.W.2d 449, 451 (Tex.1988). In *Ojeda de Toca*, the supreme court stated that the purpose of the recording statutes is to protect a good faith purchaser from losing title to real estate when that person has exercised diligence to verify the seller's ownership; they were not enacted for the purpose of protecting perpetrators of fraud. *Id.; see also ECC Parkway Joint Venture v. Baldwin*, 765 S.W.2d 504, 509 (Tex.App.—Dallas 1989, writ denied).

Defendant next argues that P.K. Pipe had actual notice of the existence of the buried chemical waste because of the presence of groundwater monitor wells on the property and because of the reference to the wells in the lease. Arguing that "[a]ctual notice includes those things that a reasonably diligent inquiry, in exercise of the means of information at hand, would have disclosed," defendant asserts that P.K. Pipe's agents had information sufficient to impose a duty to make an inquiry concerning the purpose of the wells. Again, we disagree.

■ Actual notice includes knowledge of all facts that reasonable inquiry would have disclosed. The duty of inquiry extends only to those matters that are fairly suggested by facts that are actually known, rather than circumstances that merely arouse suspicion in the mind of a reasonably prudent person. *University State Bank v. Gifford–Hill Concrete Corp.*, 431 S.W.2d 561, 570 (Tex.Civ.App.—Fort Worth 1968, writ ref'd n.r.e.).

■ Defendant told Knowles and Scruggs about the presence of wells on the property. Knowles testified, "He told us there were five or six wells on the location and that he would appreciate it if we wouldn't stack pipe on those wells and leave the wells where they could get access to them." Both men testified that defendant did not explain the purpose of the wells. When asked if the wells appeared unusual, Knowles, a resident of Uvalde, testified, "Well, where I come from, we're over an aquifer. And we have recharge wells and we drill many recharge wells. And a recharge well would look no different than one of those [monitor] wells." Further, the lease refers to the wells as "water wells," and does not explain their purpose. We find that neither the presence of the monitor wells on defendant's property nor the reference to "water wells" in the lease constituted facts sufficient to impose a duty of further inquiry upon P.K. Pipe. We overrule defendant's third point of error.

### Damages

In his fourth and fifth point of error, defendant argues that there is no evidence, or insufficient evidence, to support the findings of fact that defendant caused damages to P.K. Pipe or to support a damage award of $61,004.61. Specifically, P.K. Pipe challenges the following findings of fact:

82. P.K. Pipe paid Holmes $24,000 in lease payments.

83. P.K. Pipe paid Clair Carden, its environmental engineer, $10,610.91 for his (1) investigation of the site, (2) preparation, implementation and supervision of the remediation work, and (3) for communication with and securing approval of the remediation work from the Texas Water Commission.

84. P.K. Pipe incurred $2,026.70 in expenses for materials used in the restoration of the site.

85. P.K. Pipe paid $11,218.47 in labor costs for removal of the pipe from the clay liner over the chemical waste, and restoration of the clay liner.

86. P.K. Pipe paid $4,113.00 for the use of metal tank plates to support heavy equipment on top of the clay liner during the pipe removal.

87. P.K. Pipe paid $5,836.25 for forklifts and other equipment which was used to remove the pipe from the clay liner.

■■■ Defendant argues, first, that express provisions of the lease required P.K. Pipe to: (1) remove its property from the premises upon termination of the lease; (2) restore the leased premises to the condition that existed prior to storing pipe on the property; and (3) comply with "municipal, state and federal authorities" pertaining to the property. Defendant contends that P.K. Pipe was thus obligated to remove its pipe, restore the site, and comply with the Texas Water Commission's orders, and that he cannot, therefore, be held liable for these expenses. We disagree.

The trial court found that neither Tenneco nor P.K. Pipe would have leased the premises had they known of the chemical waste site. Absent knowledge of the chemical waste site, P.K. Pipe could not have anticipated remediating the damaged cover of a chemical waste deposit. Nor could it have anticipated removing its pipe from the site at the behest of the Texas Water Commission and in a manner calculated to protect the chemical waste site from further damage.

The measure of damages in fraud cases is the actual amount of the complaining party's loss resulting directly and proximately from the fraud practiced upon it. The desired end is compensation for the injury. *C & C Partners v. Sun Exploration and Prod. Co.*, 783 S.W.2d 707, 719 (Tex.App.—Dallas 1989, writ denied). We find that, in light of the defendant's misrepresentations, the trial court did not err in awarding damages for expenses incurred in hiring environmental engineer Carden, removing the pipe from the cap, and remediating the site.

■■■ We agree with defendant, however, that P.K. Pipe is not entitled to recover its rental payments. P.K. Pipe asserts that it was awarded the payments made under the lease on the theory that a defendant may not profit from his wrongdoing. However, the correct measure of damages in a fraud case, as noted above, is the actual amount of the complaining party's loss resulting directly and proximately from the fraud practiced upon it. P.K. Pipe presented no evidence of loss resulting from its lease of the premises other than those expenses incurred in removing the pipe from the entire site, hiring Carden, and remediating the site.[2] The trial court erred as a matter of law in awarding P.K. Pipe its lease payments.

■■■ Defendant also argues that there is no evidence or insufficient evidence to support the trial court's award of exemplary damages. We disagree. Exemplary damages are recoverable when the injury is tainted with fraud, malice, or willful wrong. *Cheek v. Humphreys*, 800 S.W.2d 596, 599 (Tex.App.—Houston [14th Dist.] 1990, writ denied). We find that the evidence is sufficient to support the trial court's finding of malice. We overrule defendant's fourth and fifth points of error.

For the reasons stated, we reform the judgment by deleting $24,000, the amount

2. Although P.K. Pipe presented evidence of expenses incurred in removing pipe from the entire 17–acre tract, the trial court awarded damages only for removing pipe from the cap, hiring Carden, and remediating the site.

of P.K. Pipe's rental payments, from the $61,004.64 total judgment. As reformed to $37,004.64, we affirm the trial court's judgment.