**Opinion issued August 29, 2013**



In The

# Court of Appeals

For The

# First District of Texas

—————————————————

## NO. 01-11-01004-CV

—————————————————

**STEVEN KELLEY RICHARDSON, MICHELLE RICHARDSON, AND RICHARD DAY, Appellants**

**V.**

**SV ALMEDA I LIMITED PARTNERSHIP, Appellee**

—————

**On Appeal from the 270th District Court**
**Harris County, Texas**
**Trial Court Case No. 2010-55843**

—————

## MEMORANDUM OPINION

Appellants Steven Kelly Richardson, Michelle Richardson, and Richard Day

sued appellee SV Almeda I Limited Partnership, asserting various causes of action

related to their alleged constructive eviction from an apartment. Almeda

counterclaimed for accelerated rent, repayment of rental concessions, and attorney's fees. The trial court granted summary judgment in Almeda's favor, ruling that the appellants take nothing by their claims and awarding Almeda damages and attorney's fees. On appeal, the appellants bring eight issues contesting the trial court's take-nothing summary judgment on each of their causes of action and the trial court's summary judgment for Almeda on its counterclaim. We reverse the trial court's judgment in part as to the award of attorney's fees. We affirm the judgment of the trial court in all other respects.

## Background

Steven and Michelle Richardson visited the Equinox Apartments to inquire about renting an apartment. The apartment complex is owned by Almeda, and it is located near the medical center in Houston, Texas. The Richardsons met the apartment manager, Susan Franz. During this conversation, they told her that their occupations—emergency helicopter pilot and emergency room nurse—required that they work irregular hours. They therefore required an apartment that would be quiet enough to allow them to sleep night or day, and they asked if the apartments were noisy. Michelle said that Franz "reassured me countless times that it was a quiet place." Michelle never put her concerns about noise in writing; Franz never put her representations that the apartment was quiet in writing, either. According

2

to the Richardsons, Franz recommended apartment 175, a ground-floor apartment near a meditation fountain, which she told them would be a quiet area.

Michelle also had concerns about the security of the apartment complex, and she conceded that she knew it was not a crime-free area before she signed the lease. However, she said that Franz assured her about the safety of the apartment complex saying that "there wasn't crime," that "it was a secure property," and because "it was a gated community . . . the only people that could come in and out were with the remote gates . . . ."

The Richardsons also told Franz that Michelle's father, Richard Day, would be living with them, and that he was a disabled Vietnam veteran. They requested a ground-floor apartment, telling Franz that Day's back and knee problems required such access as well as an accessible parking spot. Although Day testified that he had no input into the choice of the apartment, he testified that the apartment manager represented that the apartment was "very quiet, very peaceful" and suitable for his needs. Day also told Franz that he would need an accessible parking spot, and he testified that he had no complaints about the availability of suitable parking. Nobody informed Franz or any other representative of Almeda that Day suffered from post-traumatic stress disorder. None of the appellants ever made a written request for accommodations for Day's disabilities.

The Richardsons and Day all signed the lease agreement. The term of the lease was from February 9, 2009 to March 29, 2010, and thereafter it would automatically continue month-to-month unless either party gave written notice 60 days before termination. The lease included several provisions that would entitle a tenant to terminate without penalty, including (1) delay of occupancy caused by construction, repairs, cleaning or a prior resident's holding over, (2) provisions applicable to military personnel, (3) breach of certain responsibilities owed by Almeda and in accordance with Section 92.056 of the Texas Property Code, and (4) moving out after giving proper notice at the expiration of a lease term. However, the lease also provided that if those termination provisions did not apply, "you won't be released from this Lease Contract for any reason . . . . You will still be liable for the entire Lease Contract term if you move out early."

Under the lease, failure to pay rent, violation of the lease or any apartment rules, and abandonment of the apartment are among the actions that would constitute default by the resident. The lease provided that "[a]ll monthly rent for the rest of the Lease Contract term" would be "accelerated automatically" and immediately due if the tenant moved out without consent and without paying all rent for the entire lease term. The lease specifically stated that Almeda "may report unpaid amounts to credit agencies," and it reserved the right to exercise "all other legal remedies" in the event of a tenant's default.

The lease included several other provisions that are relevant to the parties' eventual dispute. With respect to the tenants' conduct while living in the apartment, it provided:

**18. COMMUNITY POLICIES OR RULES.** You and all guests and occupants must comply with any written apartment rules and community policies, including instructions for care of our property. Our rules are considered part of this Lease Contract. . . .

**19. LIMITATIONS ON CONDUCT**. . . . We may exclude from the apartment community guests or others who, in our judgment, have been violating the law, violating this Lease Contract or any apartment rules, or disturbing other residents, neighbors, visitors, or owner representatives. . . .

**20. PROHIBITED CONDUCT.** You and your occupants or guests may not engage in the following activities: criminal conduct; behaving in a loud or obnoxious manner; disturbing or threatening the rights, comfort, health, safety, or convenience of others (including our agents and employees) in or near the apartment community . . . .

Two separate sections of the lease included provisions addressing safety and security. The following provisions appeared in the section of the lease entitled "While You're Living in the Apartment":

**24. RESIDENT SAFETY AND LOSS.** You and all occupants and guests must exercise due care for your own and others' safety and security, especially in the use of smoke alarms and other detection devices, door and window locks, and other safety or security devices. . . .
. . . .

**Loss.** We're not liable to any resident, guest, or occupant for personal injury or damage, loss of personal property, or business or personal income from any cause, including, but not limited to . . . theft,

negligent or intentional acts of residents, occupants or guests, or vandalism unless otherwise required by law. . . .

. . . .

**Crime or Emergency.** Dial 911 or immediately call local medical emergency, fire, or police personnel in case of accident, fire, smoke, suspected criminal activity, or other emergency involving imminent harm. You should then contact our representative. You won't treat any of our security measures as an express or implied warranty of security, or as a guarantee against crime or of reduced risk of crime. Unless otherwise provided by law, we're not liable to you or any guests or occupants for injury, damage, or loss to person or property caused by criminal conduct of other persons, including theft, burglary, assault, vandalism, or other crimes. . . .

The section of the lease entitled "Security Guidelines for Residents" included the following provision:

**36. SECURITY GUIDELINES.** We care about your safety and that of other occupants and guests. *No security system is failsafe. Even the best system can't prevent crime. Always act as if security systems don't exist since they are subject to malfunction, tampering, and human error. We disclaim any express or implied warranties of security. The best safety measures are the ones you perform as a matter of common sense and habit.*

(Emphasis in original.) Paragraph 36 also urged adherence to 20 specific crime-prevention tips listed in the lease agreement.

In addition, the lease included a merger clause, disclaiming any oral promises or representations by the apartment's representatives:

**33. MISCELLANEOUS.** *Neither we nor any of our representatives have made any oral promises, representations, or agreements. This Lease Contract is the entire agreement between you and us. Our representatives (including management personnel, employees, and*

6

*agents) have no authority to waive, amend, or terminate this Lease Contract or any part of it, unless in writing, and no authority to make promises, representations, or agreements that impose security duties or other obligations on us or our representatives unless in writing. . . .* Written notice to or from our managers constitutes notice to or from us. Any person giving a notice under this Lease Contract should retain a copy of the memo, letter, or fax that was given, as well as any fax transmittal verification. Fax or electronic signatures are binding. All notices must be signed. Notices may not be given by email or other electronic transmission.

(Emphasis in original.)

Initially, Michelle loved the apartment. She said:

When we moved in, when we first went—I'm not gonna lie, I fell in love with the apartments. They are beautiful. I was very happy to move there, very happy with everything about the apartments. . . . [W]hen we first moved in, it was quiet, before the neighbors moved in. It was nice, wonderful.

But then, noisy neighbors moved into apartment 174, which was next door to the appellants' apartment. According to the Richardsons, the residents of apartment 174 played loud music and hosted parties until the early morning hours. Michelle also complained about the noise of sexual activity occurring in the neighboring apartment, which she described as "constant."

Neither of the Richardsons ever spoke to the neighbors about the noise or left any notes. They did not know if other residents complained of the noise in their vicinity. Day said he spoke to the neighbor about the noise once in passing, and his neighbor agreed to keep the volume of music lower. But, according to Day, the neighbor failed to do so.

7

The Richardsons contacted apartment management numerous times regarding their noisy neighbors. They made telephone calls and twice sent letters with their rent checks reiterating that they needed a quiet place to sleep because their jobs required them to be alert. They requested help in resolving the issue. Franz initially asked them not to call the police and to allow management to address the noise problem. However, they nevertheless called the police several times about the noisy neighbors. Steven testified in his deposition that he got high blood pressure as a result of noise in the apartment.

In addition to the noise, the appellants were also troubled by security issues. Steven's motorcycle was stolen from the apartment complex, and the appellants sometimes noticed people they described as vagrants sleeping in the hallway.

To address the appellants' complaints about the noise, Almeda offered them a different apartment, which was on a higher floor and farther from the elevators. None of the appellants informed any Almeda representative that Day's disability made this offer unacceptable, nor did they request any other accommodation. Rather, the Richardsons were concerned about the expense of moving to another apartment, which Almeda did not offer to reimburse. Day testified that he felt that Almeda was discriminating against him by suggesting that the appellants move to another apartment instead of requiring that the neighbors move. Day said, "[H]e was the problem, why not ask him to move . . . ."

In September 2009, the appellants vacated their apartment. They did not provide written notice in accordance with the lease provisions, but they paid rent in a prorated amount to cover the days they occupied the apartment during that month.

Almeda secured a new tenant for apartment 175 and sought to collect accelerated rent and reimbursement for rental concessions that it believed the appellants owed under the terms of the lease, less the amount it received from the new tenant in mitigation of its damages. Almeda engaged National Credit Audit Corporation (NCAC) to collect the debt. Michelle testified that she sent NCAC a letter disputing the debt. In the letter, Michelle stated, "I am a disabled person," and she argued that Almeda had violated the Fair Housing Act by "tell[ing] us we had to move to the third floor." Approximately a month later, NCAC sent Michelle a second letter stating that because she had not responded, "we are now legally entitled to assume that you acknowledge the debt but are refusing to pay voluntarily."

Approximately seven months later, the Richardsons and Day sued NCAC and Almeda. They alleged the following causes of action against Almeda: (1) violation of the Deceptive Trade Practices Act by (i) engaging in an unconscionable action or course of action, (ii) making misrepresentations or failing to disclose information in violation of Section 17.46(b) of the Texas Business &

Commerce Code, and (iii) violating the Texas Debt Collection Act; (2) breach of contract; (3) constructive eviction; (4) violation of the Texas Fair Housing Act; and (5) violation of the Federal Fair Housing Act.

They also alleged that NCAC violated the Texas Debt Collection Practices Act and the National Fair Debt Collection Practices Act while acting on behalf of Almeda. While the appellants later settled with NCAC, they alleged that Almeda was liable for NCAC's actions under an agency theory. They sought actual damages (including out-of-pocket expenses, loss of use, loss of benefit of the bargain, and costs of medical and psychiatric care), mental anguish damages, exemplary damages, and attorney's fees. Almeda counterclaimed to recover the unpaid accelerated rent, reimbursement for rental concessions, and attorney's fees.

Almeda moved for summary judgment on its counterclaim and on each of the appellants' causes of action, challenging one or more elements of each cause of action on traditional or no-evidence grounds. The trial court granted Almeda's traditional and no-evidence motion for summary judgment without specifying the grounds upon which it based its ruling. The court awarded Almeda damages as well as $8,000 in attorney's fees incurred in defending the appellants' claims and $4,000 in attorney's fees for prosecuting its breach-of-contract counterclaim. It also awarded contingent appellate attorney's fees in a maximum aggregate amount of $40,000. Finally, the court dismissed with prejudice each of the appellants'

10

causes of action against Almeda including the causes of action for violation of the Texas Debt Collection Act and the Federal Fair Debt Collection Practices Act. The Richardsons and Day appealed.

## Analysis

We review de novo the trial court's ruling on a motion for summary judgment. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). The party moving for traditional summary judgment bears the burden of showing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *see also Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215–16 (Tex. 2003). A defendant moving for summary judgment must conclusively negate at least one essential element of each of the plaintiff's causes of action or conclusively establish each element of an affirmative defense. *Sci. Spectrum, Inc. v. Martinez*, 941 S.W.2d 910, 911 (Tex. 1997).

A no-evidence summary judgment is essentially a directed verdict granted before trial, to which we apply a legal-sufficiency standard of review. *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 581–82 (Tex. 2006). Under the no-evidence summary-judgment rule, the movant may move for summary judgment if, after adequate time for discovery, there is no evidence of one or more essential elements of a claim or defense on which the nonmovant would have the burden of

11

proof at trial. TEX. R. CIV. P. 166a(i). The motion must state the elements as to which there is no evidence. *Id.* The reviewing court must grant the motion unless the nonmovant produces summary-judgment evidence raising a genuine issue of material fact. *Id.*; *Mack Trucks*, 206 S.W.3d at 582. A genuine issue of material fact exists if the nonmovant produces evidence that would enable reasonable and fair-minded jurors to differ in their conclusions. *Hamilton v. Wilson*, 249 S.W.3d 425, 426 (Tex. 2008) (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 816 (Tex. 2005)).

## I. Fair Housing Act claims

In their fourth issue, the appellants allege that the trial court erred by granting summary judgment on Day's claims for violation of the Federal and Texas Fair Housing Acts. In the first amended petition, Day alleged that Almeda violated both fair housing acts by failing to make reasonable accommodations regarding rules, policies, practices, or services when such accommodation was necessary to afford him an equal opportunity to enjoy the premises.

Under the Federal Fair Housing Act, it is unlawful to discriminate against a person "in the terms, conditions, or privileges of . . . rental of a dwelling . . . because of a handicap of . . . that person or . . . a person residing . . . in the dwelling after it is . . . rented . . . ." 42 U.S.C. § 3604(f)(2). "[D]iscrimination includes . . . a refusal to make reasonable accommodations in rules, policies,

12

practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." *Id.* § 3604(f)(3)(B). One purpose of the Texas Fair Housing Act is to "provide rights and remedies substantially equivalent to those granted under federal law." TEX. PROP. CODE ANN. § 301.002 (West 2013). Under the Texas Fair Housing Act, it is unlawful for a person to discriminate against another "in the terms, conditions, or privileges of . . . rental of a dwelling . . . because of a disability of . . . the other person [or] a person residing in or intending to reside in that dwelling after it is . . . rented . . . ." TEX. PROP. CODE ANN. § 301.025(b) (West 2007). "[D]iscrimination includes . . . a refusal to make a reasonable accommodation in rules, policies, practices, or services if the accommodation may be necessary to afford the person equal opportunity to use and enjoy a dwelling . . . ." *Id.* § 301.025(c)(2). Implicit in the concept of "refusal" is the notion that the plaintiff must make a request for an accommodation. *Cf. Groome Res. Ltd., L.L.C. v. Parish of Jefferson*, 234 F.3d 192, 198 (5th Cir. 2000); *see also* 42 U.S.C. § 12112(b)(5)(A) (defining discrimination under the Americans with Disabilities Act to include "not making reasonable accommodations"); *Taylor v. Principal Fin. Grp., Inc.*, 93 F.3d 155, 165 (5th Cir. 1996) (holding that absent a request from an employee for a reasonable accommodation, the employer cannot be held liable for failing to provide one).

13

Thus, under both statutes, to prevail on a cause of action for violation of the "reasonable accommodation" provision, the plaintiff must show that he requested a reasonable accommodation and the defendant refused to make it. *Cf. Groome Res.*, 234 F.3d at 198; *Taylor*, 93 F.3d at 165.

Almeda moved for summary judgment on the ground that there is no evidence that it failed to make a reasonable accommodation that was necessary to afford Day an equal opportunity to enjoy the premises. In response, Day argued that the apartment complex knew that he was disabled due to his arthritic knees, that he requested an accommodation in the form of an accessible parking spot, and that he was deprived of the use of his apartment and the serenity pool area because of noise. On appeal Day argues that there is a material issue of fact as to whether Almeda's failure to make and enforce rules for use of the serenity pool area and its "moving [Day] to a much further walk on his arthritic knees" constituted a failure to make a reasonable accommodation in violation of the state and federal fair housing acts.

As summary-judgment proof, Day provided his affidavit and those of the Richardsons, which stated that prior to signing the lease, they informed Franz that: (1) Day is a disabled veteran, (2) he has arthritic knees, (3) he could not walk far from his car to the door, (4) he would require an accessible parking space, (5) he needed a ground-floor apartment, and (6) due to his disability, he required quiet.

14

Steven's deposition testimony also showed that he had informed Franz and another representative of the apartment complex that Day had a bad back. Steven said they chose a ground-floor apartment because it would be easier for Day to get around.

However, in Michelle's deposition, she specifically testified that she did not inform the apartment representatives that her father suffered from PTSD. Neither Day's deposition excerpt nor Almeda's interrogatory answers provide any additional information about Day's disability or his fair housing claims. There is no evidence pertaining to making or enforcing rules for use of the serenity pool, nor is there evidence that Almeda moved Day to a "much further walk on his arthritic knees."

The evidence shows that in response to the appellants' initial request for a ground-floor apartment, they were given a ground-floor apartment. It also shows that Day had an opportunity to use the accessible parking spots and that neither Day nor the Richardsons ever made any other request for an accommodation for Day. Rather, in response to Almeda's offer to allow the appellants to move to another apartment, the appellants abandoned the lease without requesting an accommodation.

Almeda's no-evidence motion for summary judgment attacked the element of failure to make a reasonable accommodation. In light of the conclusive proof that there was no request for an accommodation and the complete absence of

15

evidence that the apartment complex refused to make a requested reasonable accommodation, we hold that the trial court did not err in granting summary judgment on Day's state and federal fair housing causes of action. *Cf. Groome Res.*, 234 F.3d at 198; *see also* 42 U.S.C. § 12112(b)(5)(A); *Taylor*, 93 F.3d at 165.

## II. Constructive eviction

In their fifth issue, the appellants allege that the trial court erred by granting summary judgment on their constructive eviction claim. In their first amended petition, the appellants alleged that their lease included an implied covenant of quiet enjoyment, which Almeda breached. The petition does not allege any facts showing how Almeda constructively evicted the appellants. "A constructive eviction occurs when the tenant leaves the leased premises due to conduct by the landlord which materially interferes with the tenant's beneficial use of the premises." *Fidelity Mut. Life Ins. Co. v. Robert P. Kaminsky, M.D., P.A.*, 768 S.W.2d 818, 819 (Tex. App.—Houston [14th Dist.] 1989, no writ). "Texas law relieves the tenant of contractual liability for any remaining rentals due under the lease if he can establish a constructive eviction by the landlord." *Id.* "Constructive eviction essentially terminates mutuality of obligation as to the lease terms, because the fundamental reason for the lease's existence has been destroyed by the landlord's conduct." *Downtown Realty, Inc. v. 509 Tremont Bldg., Inc.*, 748 S.W.2d 309, 313 (Tex. App.—Houston [14th Dist.] 1988, no writ). The elements

of a cause of action for constructive eviction are (1) an intention on the part of the landlord that the tenant shall no longer enjoy the premises, (2) a material act by the landlord that substantially interferes with the tenant's intended use and enjoyment of the premises, (3) an act that permanently deprives the tenant of the use and enjoyment of the premises, and (4) abandonment of the premises by the tenant within a reasonable time after the commission of the act. *Lazell v. Stone*, 123 S.W.3d 6, 11–12 (Tex. App.—Houston [1st Dist.] 2003, pet. denied).

The landlord's intent may be inferred from the circumstances. *Id.* at 12. For example, in *Lazell*, this court held that changing the locks and informing a commercial tenant that she is not welcome on the property when rent was only a few days late and no notice of default had been given was evidence of the landlord's intent to constructively evict the tenant. *See id.* at 8, 12.

In *Columbia/HCA v. Tea Cake French Bakery & Tea Room*, 8 S.W.3d 18 (Tex. App.—Houston [14th Dist.] 1999, pet. denied), HCA purchased land and a shopping center in a location where it intended to build a hospital. 8 S.W.3d at 19. HCA negotiated early termination of all the shopping center tenants' leases, except for that of Tea Cake. *Id.* HCA began construction of the hospital before the expiration of Tea Cake's lease but without demolishing the shopping center. *Id.* On appeal from a directed verdict on Tea Cake's constructive eviction claim, the court of appeals held that there was a question of fact because (1) the landlord paid

tenants to leave the premises, (2) the shopping center was nearly vacant, and (3) the near vacancy of the shopping center destroyed a significant portion of Tea Cake's walk-in business. *Id.* at 22.

However, in *Quitta v. Fossati*, 808 S.W.2d 636 (Tex. App.—Corpus Christi 1991, writ denied), the court of appeals held that the landlord's threat to "get the sheriff" to evict the tenants was not evidence of constructive eviction. 808 S.W.2d at 643. The court explained that there must be evidence of "some additional feature, such as harassing incidents disturbing to the tenant's peaceful possession and occurring on the property." *Id.*

Among other grounds, Almeda moved for summary judgment on this cause of action because there was no evidence of intent. In response, the appellants submitted their own affidavits and Steven's deposition testimony. The affidavits show that all three appellants were troubled by the noise and that complaints to the apartment complex sometimes resulted in a temporary cessation of noise but sometimes brought no relief. In addition, the affidavits and deposition testimony showed that rather than requiring the neighbors to be quiet, the apartment complex offered the appellants an opportunity to move to another apartment at their own expense. The evidence does not show that the apartment complex in any way required the appellants to move or otherwise disturbed their possession of the apartment. That Almeda offered the appellants an alternative apartment is not

18

evidence that they were being deprived of their leased apartment or that Almeda intended to evict them. We overrule this issue.

### III. Texas Debt Collection Practices Act

In their sixth issue, the appellants argue that the trial court erred by granting summary judgment on their claims for violation of the Texas Debt Collection Practices Act. *See* TEX. FIN. CODE ANN. §§ 392.001–.404 (West 2006). In their first amended petition, they alleged that NCAC, acting as an agent for Almeda, violated the TDCPA by: (1) misrepresenting or threatening to misrepresent to another person that they willfully refused to pay a nondisputed consumer debt when the debt was in dispute and the NCAC had been notified in writing of the dispute, *see id.* § 392.301(a)(3); (2) threatening to take actions prohibited by law, *see id.* § 392.301(a)(8); and (3) misrepresenting the character, extent, or amount of a consumer debt, *see id.* § 392.304(a)(8). They also alleged that they suffered actual damages and mental anguish, but the pleading did not provide any specific facts pertaining to these elements of damages.

Almeda moved for summary judgment asserting, among other grounds, that there was no evidence that the appellants suffered any injury as a result of the alleged violations of the TDCPA. In response to Almeda's traditional motion for summary judgment, the appellants attached an unsworn amended response to a

19

request for disclosure which included the following factual statements pertaining to damages:

> Plaintiffs Steven and Michelle Richardson incurred moving expenses of $10,000.00. From September 7, 2009 through March 1, 2010 (the latter date being the day the lease ended) Plaintiff Steven Richardson incurred commute expenses of $2,000.00. Plaintiff Michelle Richardson incurred additional commute expenses of $1,500.00. Plaintiff Steven Richardson's motorcycle at the time of its theft had a fair market value of $8,500.00. Plaintiff Steven Richardson has incurred medical expenses in excess of $1,000.00. The apartment we paid for cost $1777.00 per month and was worthless. We paid rent, including the prorated portion of the month we moved out, in the amount of $10,789.00. Plaintiff Michelle Richardson and Plaintiff Steven Richardson suffered overlapping economic damages in the amount [of] $33,786.00.

> Plaintiff Richard Day suffered $2,000.00 in damages for increased commuter costs.

In response to Almeda's no-evidence motion for summary judgment as to their TDCPA claim, the appellants did not respond to the contention that there was no evidence of damages. Even considering the appellants' response to the traditional motion for summary judgment on the element of TDCPA damages, we conclude that there is no evidence of damages from a violation of the TDCPA because the appellants' unsworn discovery disclosure includes no factual allegation of any harm resulting from the alleged TDCPA violation, and in any case it is not competent summary-judgment evidence. *See Schulz v. State Farm Mut. Auto. Ins. Co.*, 930 S.W.2d 872, 876 (Tex. App.—Houston [1st Dist.] 1996, no writ) ("Answers to interrogatories and discovery responses may only be used against the

party who answered them."). We hold that the trial court did not err in granting summary judgment as to the appellants' TDCPA claim. We overrule this issue.

## IV.    Federal Fair Debt Collection Practices Act

In their seventh issue, the appellants argue that the trial court erred in granting summary judgment on their claims for violation of the Federal Fair Debt Collection Practices Act. *See* 15 U.S.C. §§ 1692–1692p. In their first amended petition, the appellants alleged that NCAC, while acting on behalf of Almeda: (1) violated 15 U.S.C. § 1692e(a)(2) by "misrepresenting the character or amount of a consumer debt" because they owed nothing or were excused from performing under the lease by Almeda's prior breach; (2) violated 15 U.S.C. § 1692(e)(a)(5) by "threatening to take action that cannot be legally taken or that was not intended to be taken" by threatening to report the debt as undisputed when they previously informed NCAC in writing that they disputed the debt; and (3) violated 15 U.S.C. § 1692e(a)(8) by "threatening to communicate false credit information, including that the failure to communicate that a disputed debt is disputed," specifically by stating in the February 17, 2010 collection letter that it intended to report the debt as undisputed to credit agencies. The appellants further alleged that they suffered actual damages including mental anguish as a result of the violations of the Federal Fair Debt Collection Practices Act.

21

The February 17, 2010 letter that forms the basis of the appellants' debt collection claims was addressed only to Michelle. In the subject line it identified "Equinox Apt 175," showed a file number, and stated a balance of $3,257.30. The letter stated:

> We have corresponded with you previously, concerning the above referenced account.
>
> Unfortunately, you have failed to respond in a timely manner. As a consequence, we are now legally entitled to assume that you acknowledge the debt but are refusing to pay voluntarily.
>
> My client expects me to pursue all available legal remedies to effect collection of your account. I urge you to make additional collection efforts unnecessary by remitting the balance or contacting me immediately to discuss payment options. . . . For your convenience, we can accept at no additional cost, checks by phone, Western Union Quick Collect, credit and debit cards.
>
> Further procrastination on your part will only result in greater expense as well as other undesirable consequences. Act now to protect your credit. I will allow 7 days for your response.

The bottom of the letter read, "This is an attempt to collect a debt. Any information obtained will be used for that purpose."

Almeda moved for traditional summary judgment on the grounds that it is not a debt collector and the appellants were not injured. Almeda also argued that even if it were a debt collector, there still was no evidence that it used a false, deceptive, or misleading representation or means in connection with the collection

of a debt against the appellants, or that the appellants were injured as a result of the alleged conduct.

The Federal Fair Debt Collection Practices Act prohibits a debt collector from using "any false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 U.S.C. § 1692e. A prevailing plaintiff may recover actual damages, additional damages up to $1,000, costs, and reasonable attorney's fees for prosecuting the civil action. *Id.* § 1692k. "Actual damages can include damages for emotional distress, out-of-pocket expenses, personal humiliation, embarrassment, or mental anguish." *Agueros v. Hudson & Keyse, LLC*, No. 04-09-00449-CV, 2010 WL 3418286, at *6 (Tex. App.—San Antonio Aug. 31, 2010, no pet.) (citing *Harrington v. Nat'l Enter. Sys., Inc.*, No. 4:08cv422, 2010 WL 890176, at *4 (E.D. Tex. Mar. 9, 2010)). However, the debtor must prove he suffered some specific loss to recover actual damages. *Id.* "Generally, an award of mental anguish damages must be supported by direct evidence that the nature, duration, and severity of mental anguish was sufficient to cause, and caused, either a substantial disruption in the plaintiff's daily routine or a high degree of mental pain and distress." *Serv. Corp. Int'l v. Guerra*, 348 S.W.3d 221, 231 (Tex. 2011). Thus "evidence of the nature, duration, and severity of the mental anguish is required." *Id.* To overcome Almeda's no-evidence motion for summary judgment, the appellants must have produced some evidence that, as a

23

result of the allegedly improper debt collection activities, they each suffered "a high degree of mental pain and distress" that is "more than mere worry, anxiety, vexation, embarrassment, or anger," or that substantially disrupted their routines. *See Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444 (Tex. 1995).

First, the record shows that the allegedly improper debt collection letter was addressed and sent only to Michelle, not to Steven or her father. However, the appellants all produced affidavits to support their allegations that they were injured as a result of the alleged violations of the Federal Fair Debt Collection Practices Act.

Steven's affidavit in relevant part primarily addressed injuries resulting from the noise he encountered at the apartment complex and his subsequent move. That portion of the affidavit did not show that any of his claimed economic damages resulted from the debt collection actions, about which he said:

> 13. As a result of National Credit Audit Corporation trying to collect an invalid debt from me, threatening to take legal action they could not take, and threatening to report the debt as undisputed, caused me to suffer even more indignation and embarrassment causing further disruption of my daily routine. I was caused to feel constantly indignant, tense, disgusted, physically ill, and upset.

However, these statements are conclusory because they lack factual support as to the nature, duration, or extent of the stated emotional distress or how his daily routine was disrupted. Therefore, these statements are insufficient to overcome a

24

no-evidence challenge to the element of injury as to Steven. *See Serv. Corp. Int'l*, 348 S.W.3d at 231; *Parkway Co.*, 901 S.W.2d at 444.

Likewise, Michelle's affidavit described the bothersome noise and its impacts on her family, as well as the costs associated with vacating the apartment. She specifically addressed the debt collection activities, saying:

> As a result of [NCAC] trying to collect an invalid debt from us, threatening to take legal action they could not take, and threatening to report the debt as undisputed, caused me to suffer even more indignation and embarrassment causing further disruption of my daily routine. I was caused to feel constantly indignant, tense, disgusted, physically ill, and upset. The debt was invalid because they breached the contract first and also forced us to move out. They threatened to represent that the debt was undisputed because . . . the letter states that we failed to 'timely respond' and they could 'assume' our acknowledgement of the debt but are refusing to pay voluntarily. They therefore, also threatened to take action they legally could not take. They also threatened to report it to a credit bureau. This letter, just like their previous letter, misrepresented the extent or nature of a debt, because of [Almeda's] conduct, we did not owe them anything.

The exact same paragraph appears in Day's affidavit, and it, too, is his only evidence of injury sustained as a result of the debt collection practices. As with Steven's affidavit, these statements are conclusory because they lack factual support as to the nature, duration, or extent of the alleged emotional distress or how their daily routines were disrupted. Therefore, these statements are insufficient to overcome a no-evidence challenge to the element of injury as to Michelle and Day. *See Serv. Corp. Int'l*, 348 S.W.3d at 231; *Parkway Co.*, 901 S.W.2d at 444.

Because there is no evidence upon which a reasonable fact finder could find that any of the appellants suffered damages as a result of the allegedly improper debt collection practices, we hold that the trial court did not err in granting summary judgment as to the FDCPA claim. We overrule this issue.

## V.     Breach of contract

In their second and third issues, the appellants challenge the trial court's summary-judgment rulings on their cause of action for breach of contract and on Almeda's counterclaim for breach of contract.

### A. The appellants' contract claim

In their first amended petition, the appellants alleged that Almeda breached the lease agreement based upon the following events: (1) Almeda represented that the apartment would be suitable for the appellants and that there had been no reports of theft; (2) the appellants were disturbed by noise from the neighboring apartment during late hours of the night and early hours of the morning; (3) Almeda proposed that the appellants move to a different apartment on a higher floor of the apartment building; (4) Steven's motorcycle was stolen from the apartment complex; and (5) the noise, theft of personal property, and "discrimination on the basis of disability" constituted constructive eviction.

Almeda inquired about the breach-of-contract allegations during each appellant's deposition. Michelle testified that Almeda breached the part of the

contract that required them to "provide a quiet environment, safe environment." Steven testified that he believed Almeda breached its contract by failing to resolve their noise complaints. He said he did not know which provision of the contract was breached in this way, but he said, "There's a clause in there that talks about the right to peace and quiet and things like that. . . . [T]here's something in there that references the fact that if there's a problem, this is the way you should notify the management company and do it in writing, and we did that. And, also, we made the verbal requests and things of such, and there was no resolve ever offered." Day testified that he believed Almeda breached the lease by suggesting that the appellants move instead of suggesting that the noisy neighbors move and by failing to give them a quiet place.

Almeda moved for summary judgment on grounds that (1) the appellants did not perform or tender performance under the lease and were not excused from performance, (2) none of the allegations against Almeda constitute a breach of the lease, and (3) there is no evidence that (i) the appellants performed, tendered performance, or were excused from performing their obligations under the lease, (ii) Almeda breached the lease, or (iii) the appellants were injured by any alleged breach of the lease by Almeda. In response to the motion, the appellants argued, among other things, that they performed under the lease until they were constructively evicted and that the constructive eviction excused further

27

performance under the lease. They also argued that Almeda breached the contract by breaching the implied covenant of quiet use and enjoyment and by failing to comply with fair housing laws.

The essential elements of a breach-of-contract claim are: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach. *Luccia v. Ross*, 274 S.W.3d 140, 146 (Tex. App.—Houston [1st Dist.] 2008, pet. denied). "A breach of the covenant of quiet enjoyment requires an eviction, actual or constructive, brought about by the acts of the landlord, those acting for the landlord, or those acting with the landlord's permission." *Holmes v. P.K. Pipe & Tubing, Inc.*, 856 S.W.2d 530, 539 (Tex. App.—Houston [1st Dist.] 1993, no writ). We have already held that the trial court did not err by granting summary judgment on the appellants' cause of action for constructive eviction. "In the absence of constructive eviction, there can be no breach of the covenant of quiet enjoyment." *Id.* at 541. Therefore, we hold that the appellants' summary-judgment evidence does not create a genuine issue of material fact as to Almeda's alleged breach of the implied covenant of quiet use and enjoyment. *See id.*

The appellants correctly state that the lease required Almeda to "substantially comply with all applicable laws regarding . . . fair housing."

28

However, we have already held that the trial court did not err by granting summary judgment as to the appellants' fair housing causes of action because there is no evidence that Almeda refused to make a requested accommodation. We likewise conclude that there is no evidence that Almeda breached the lease by failing to substantially comply with all applicable laws regarding fair housing.

Finally, the evidence is undisputed that the appellants did not provide written notice of their intention to vacate the apartment 60 days in advance and that they did not pay the full amount of rent due through the end of the lease term. Because the appellants did not fully perform under the contract and because their non-performance was not excused by constructive eviction, we conclude that there is no genuine issue of material fact as to that element of the appellants' breach-of-contract claim.

We hold that the trial court did not err by granting summary judgment on the appellants' breach-of-contract cause of action, and we overrule this issue.

### B. Almeda's contract counterclaim

In its first amended counterclaim, Almeda alleged that the appellants breached the lease by vacating the premises before the expiration of the lease term without giving 60 days' notice and without paying the accelerated rent and other amounts that were due under the lease. Almeda moved for traditional summary judgment on its counterclaim, attaching as evidence the appellants' original

petition, the lease agreement, an affidavit from Susan Franz, a copy of a resident ledger showing amounts paid on the appellants' account, and transcripts from the appellents' depositions. In response, the appellants argued that their breach of the lease was excused by Almeda's breach of its implied covenant of quiet use and enjoyment. The appellants proffered evidence to support their contentions that their neighbors were noisy, that the noise was troublesome to them and caused them stress, that they complained to apartment management about the noise, and that management offered them an alternative apartment on a higher floor. They further argued that there was no evidence that Almeda "attempted to move, evict, or otherwise remedy the noise violations vis a vis the noisy neighbors in the adjacent apartment." The appellants also argued about the rental concessions, stating that Almeda's motion for summary judgment failed to "state how paragraph 32 of the parties' lease agreement justifies the concession charges charged by [Almeda] and therefore fails to provide adequate notice on what basis summary judgment is sought." The appellants did not provide any evidence pertinent to the issue of concession fees.

We have already held that there is no genuine issue of material fact on the appellants' cause of action for breach of contract based on a breach of the implied covenant of quiet use and enjoyment. *See Holmes*, 856 S.W.2d at 541. The appellants brought forth no evidence to create a genuine issue of material fact as to

the justification for the rental concession charges. Thus, the trial court's summary judgment as to Almeda's breach-of-contract counterclaim is proper if Almeda's summary-judgment evidence shows that it is entitled to judgment as a matter of law. *See* TEX. R. CIV. P. 166a(c); *see also Provident Life & Accident Ins. Co.*, 128 S.W.3d at 215–16.

It is undisputed that the appellants signed the lease agreement. It is also undisputed that the lease expired March 29, 2010, and that the appellants vacated the apartment in September 2009 without providing 60 days' written notice and without Almeda's consent. There is neither evidence nor argument that any of the other contractual justifications for termination of the lease apply in this case, other than those that we have already held to be unavailing. Franz's affidavit shows that the appellants owed $3,955.11 for accelerated rent and reimbursement of rental concessions based on (i) the date of their departure, (ii) their monthly rent, (iii) the date when a new tenant moved into the vacated apartment, mitigating Almeda's damages, and (iv) credits for prorated September 2009 rent paid by the appellants and other deposits. The trial court rendered summary judgment in Almeda's favor for the amount of $3,955.11. We hold that it did not err in doing so, and we overrule this issue.

## VI. DTPA claims

In their first issue, the appellants challenge the trial court's summary-judgment ruling on their causes of action for violation of the Texas Deceptive Trade Practices Act. In their first amended petition, the appellants alleged that Almeda violated the DTPA by (1) engaging in an unconscionable action or course of action, TEX. BUS. & COM. CODE ANN. §§ 17.45(5) & 17.50(a)(3) (West 2011); (2) engaging in false, misleading, or decetive acts or practices in the conduct of trade or commerce by (i) representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have, *id.* § 17.46(b)(5), (ii) representing that an agreement concerning goods or services confers or involves rights, remedies, or obligations which it does not have or involve, *id.* § 17.46(b)(12), and (iii) failing to disclose information concerning goods or services which was known at the time of the transaction with the intention to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed *id.* § 17.46(b)(24); and (3) by engaging in false, misleading, or deceptive acts prohibited by the Texas Debt Collection Act, *see* TEX. FIN. CODE ANN. § 392.404(a). The appellants did not specify which statements or actions formed the basis for each alleged misrepresentation or unconscionable act, and Almeda did not specially except to the pleading.

Almeda moved for summary judgment on the grounds that (1) as a matter of law, a merger clause in the lease agreement negated any assertion of misrepresentation, and (2) the lease agreement expressly disclaimed the existence of express or implied warranties. Almeda also moved on the grounds that there was no evidence that it: (3) engaged in a false, misleading, or deceptive act or practice that is specifically enumerated in section 17.46(b) of the DTPA; (4) breached an express or implied warranty; (5) engaged in an unconscionable action or course of action; or (6) engaged in any action that was a producing cause of any damages suffered by the Richardsons or Day.

In response, the appellants alleged that the following Almeda misrepresentations are actionable as violations of section 17.46(b)(5): (1) that "the apartment they were renting provided the safe, quiet environment they specifically required"; (2) that "the apartment was free from extraneous noise to the extent that Plaintiffs would obtain sufficient rest to perform their occupations"; and (3) that "a location near the serenity pool would provide even greater degree of quiet." The appellants further argued that the following Almeda misrepresentations are actionable as violations of section 17.46(b)(12): (1) that Almeda told the appellants they could do nothing about noise violations and (2) that "if Plaintiffs wanted quiet enjoyment of their lease they had to move to another floor at their expense for even higher rent." But as to alleged violations of section 17.46(b)(24), the appellants

33

did not identify any specific statements or actions as violating this provision. The appellants argued that Almeda further engaged in the following unconscionable actions or course of actions: (1) representing at the time of the transaction that the apartment would be quiet enough for them to obtain rest needed to perform their occupations; (2) representing that the area near the serenity pool would "enhance the placidity" and "provide suitable lack of noise"; (3) representing that there was a lack of criminal activity on the premises; (4) refusing to properly address noise complaints; (5) failing to conduct an adequate investigation; (6) refusing to enforce rules or policies contained in the lease; and (7) misrepresenting to the appellants that their sole remedy was to move to another apartment on another floor at greater expense and at the appellants' inconvenience.

"The DTPA grants consumers a cause of action for false, misleading, or deceptive acts or practices." *Amstadt v. U.S. Brass Corp.*, 919 S.W.2d 644, 649 (Tex. 1996); TEX. BUS. & COM. CODE ANN. § 17.50(a)(1) (West 2011). To prevail under the DTPA, a plaintiff must show that (1) he was a consumer; (2) the use or employment of a false, misleading or deceptive act or practice that is either (i) a specifically enumerated "laundry-list" violation under DTPA section 17.46(b) on which he detrimentally relied or (ii) any unconscionable action or course of action; and (3) the wrongful act was a producing cause of his economic or mental-anguish damages. *See* TEX. BUS. & COM. CODE ANN. § 17.50.

34

First, to the extent that the appellants' DTPA claims are based on violation of the Texas Debt Collection Practices Act, in light of our holdings as to constructive eviction, breach of contract, and violation of the Texas Debt Collection Practices Act, we further hold that the trial court did not err in granting summary judgment as to any DTPA claims based on this tie-in statute.

Second, as to the representations made prior to or contemporaneous with the signing of the lease, the appellants brought forth no evidence to refute Almeda's no-evidence motion for summary judgment. Generally, an act is false, misleading, or deceptive if it has the capacity to deceive an "ignorant, unthinking, or credulous person." *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 479–80 (Tex. 1995) (quoting *Spradling v. Williams*, 566 S.W.2d 561, 562 (Tex. 1978)). Absent evidence that the defendant's statement was false, a DTPA action for misrepresentation cannot survive summary judgment. *Id.*; *see Pennington v. Singleton*, 606 S.W.2d 682, 687 (Tex. 1980) (finding assertions that an engine housing was in "excellent" and "perfect" condition were actionable under the DTPA because they misrepresented its actual characteristics). The DTPA's purpose in making misrepresentations actionable is "to ensure that descriptions of goods or services offered for sale are accurate." *Id.*; *Pennington*, 606 S.W.2d at 687. While the appellants correctly note that there is no requirement that Almeda or its representative have knowledge of the falsity of the statement to be actionable

under the DTPA, the statement still must be shown to have been false. *See Doe*, 907 S.W.2d at 479–80. The appellants' summary-judgment evidence shows only that, more than a month after they moved in, the apartment was not quiet or free from crime. There was no evidence that the apartment was noisy or that the apartment complex was unsafe or not secure when Franz allegedly made the representations about noise and security. Because there was no evidence that Franz's alleged statements were false, the trial court did not err in granting summary judgment on this basis. *Id.*

Third, as to the appellants' allegations that Almeda violated the DTPA by engaging in an unconscionable action or course of action by not investigating their complaints, not enforcing community rules, and offering them an alternative apartment, we likewise conclude that the trial court did not err in granting summary judgment. "'Unconscionable action or course of action' means an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree." TEX. BUS. & COM. CODE ANN. §17.45(5). Unconscionability under the DTPA is an objective standard for which scienter is irrelevant. *See Chastain v. Koonce*, 700 S.W.2d 579, 583 (Tex. 1985); *see also Bradford v. Vento*, 48 S.W.3d 749, 760 (Tex. 2001); *Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667, 677 (Tex. 1998). To be actionable under the statutory standard, the defendant must have

36

taken advantage of the consumer "to a grossly unfair degree," meaning that "the resulting unfairness was glaringly noticeable, flagrant, complete and unmitigated." *Chastain*, 700 S.W.2d at 583–84. This determination is made "by examining the entire transaction and not by inquiring whether the defendant intended to take advantage of the consumer or acted with knowledge or conscious indifference." *Id.* at 583.

The appellants' summary-judgment evidence on this issue included affidavits from the Richardsons and Day stating that Almeda refused to address their issue with the noisy neighbors. Michelle testified that Almeda "would require us to move at our expense and inconvenience." They also offered Steven's deposition testimony describing the noise issues and how that made the apartment unusable. However, the portions of his deposition testimony proffered in response to both the traditional and no-evidence motions for summary judgment did not address any actions taken by Almeda. Similarly, the portions of Day's deposition that the appellants relied upon to refute Almeda's no-evidence motion say nothing about the actions of the apartment complex. Finally, the appellants also produced leases for their neighbors' apartments, which contain the same boilerplate provisions regarding limitations on conduct, such as a prohibition against behaving in "a loud or obnoxious manner." However, the leases all also say that Almeda "may" exclude guests or others who "in our judgment" violate the lease or

37

apartment rules. Though the appellants' evidence shows that Almeda declined to exclude or evict the noisy neighbors, in light of the discretion afforded in the lease contract, none of the appellants' evidence shows that Almeda took advantage of the appellants "to a grossly unfair degree," *See id.* at 583–84. Accordingly, we hold that the trial court did not err in granting summary judgment on this ground, and we overrule the appellants' first issue.

## VII. Attorney's fees

In their eighth issue, the appellants challenge the trial court's award of attorney's fees to Almeda. In its motion for summary judgment, Almeda argued that it had incurred "approximately $8,000.00 in reasonable and necessary attorney's fees defending against Plaintiffs' claims and $4,000.00 in reasonable and necessary attorney's fees prosecuting [its] counterclaims." Almeda attached the affidavit of its attorney, James Muska, to support its fees claim. Muska's affidavit described the actions taken in the course of his representation. He also attested that his hourly rate is $175 and that he spent approximately 68 hours working on the matter, with approximately 46 hours spent "defending against Plaintiffs' claims asserted in this action" and approximately 22 hours "for prosecuting Defendant's counterclaims." Finally, he attested to a total of $40,000 in contingent appellate attorney's fees.

In response, the appellants produced no controverting evidence, but they argued that Almeda was not entitled to attorney's fees on its counterclaim because it was not entitled to prevail on that claim. They also argued that Almeda was not entitled to attorney's fees for defending against their claims because the evidence was insufficient to establish that contractual and noncontractual claims were inextricably intertwined.

First, although the appellants challenge the full $12,000 award of trial attorney's fees, they made no challenge to the $4,000 award for the counterclaim except to say that Almeda was not entitled to such fees unless it prevailed. Under Texas law, a party may recover reasonable attorney's fees from an individual or corporation, in addition to the amount of a valid claim and costs, if the claim is for breach of an oral or written contract. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 38.001(8) (West 2008). The lease provided certain remedies upon a tenant's default, including recovery of costs and attorney's fees:

> Unless a party is seeking exemplary, punitive, sentimental, or personal-injury damages, the prevailing party may recover from the non-prevailing party attorney's fees and all other litigation costs. We [Almeda] may recover attorney's fees in connection with enforcing our rights under this Lease Contract.

Because the summary-judgment evidence does not create a genuine issue of material fact as to the award of $4,000 in attorney's fees for prosecution of its

breach-of-contract counterclaim, we hold that the trial court did not err in rendering such judgment.

Second, we consider the award of $8,000 in trial attorney's fees for defending against the appellants' claims. In its first amended answer, Almeda alleged that the appellants' DTPA claims, TDCPA claims, and fair housing act claims were brought in bad faith or for the purpose of harassment. However, Almeda made no mention in its motion for summary judgment of entitlement to attorney's fees as a sanction. Thus, the trial court's summary judgment for $8,000 is not supportable on the ground that it is a sanction. *See* TEX. R. CIV. P. 166a(c) ("Issues not expressly presented to the trial court by written motion, answer or other response shall not be considered on appeal as grounds for reversal.").

Thus, we must determine if Almeda's summary-judgment proof established its entitlement to the $8,000 attorney's fee award. *Cf. McConnell v. Southside Indep. Sch. Dist.*, 858 S.W.2d 337, 343 (Tex. 1993) ("[S]ummary judgments must stand or fall on their own merits, and the non-movant's failure to answer or respond cannot supply by default the summary judgment proof necessary to establish the movant's right."). The general rule is that fee claimants must "segregate fees between claims for which they are recoverable and claims for which they are not." *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 311 (Tex. 2006). Relying on *Stewart Title Guaranty Co. v. Aiello*, 941 S.W.2d 68

40

(Tex. 1997), Almeda argues it is entitled to all of its attorney's fees because all of the claims rely on "essentially the same facts." *See* 941 S.W.2d at 73. The Supreme Court of Texas has held that "when the causes of action involved in the suit are dependent upon the same set of facts or circumstances and thus are 'interwined to the point of being inseparable,' the party suing for attorney's fees may recover the entire amount covering all claims." *Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 11 (Tex. 1991); *accord Aiello*, 941 S.W.3d at 73. However, the Supreme Court of Texas modified this holding in *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299 (Tex. 2006), in which it held, "Intertwined facts do not make tort fees recoverable; it is only when discrete legal services advance both a recoverable and unrecoverable claim that they are so intertwined that they need not be segregated." 212 S.W.3d at 313–14. The Court noted:

> But *Sterling* was certainly correct that many if not most legal fees in such cases cannot and need not be precisely allocated to one claim or the other. Many of the services involved in preparing a contract or DTPA claim for trial must still be incurred if tort claims are appended to it; adding the latter claims does not render the former services unrecoverable. Requests for standard disclosures, proof of background facts, depositions of the primary actors, discovery motions and hearings, *voir dire* of the jury, and a host of other services may be necessary whether a claim is filed alone or with others. To the extent such services would have been incurred on a recoverable claim alone, they are not disallowed simply because they do double service.

*Id.* at 313.

41

The summary-judgment evidence in this case affirmatively demonstrates that some discrete legal services were rendered only for claims for which attorney's fees are not recoverable. For example, Muska's affidavit attests that he reviewed DTPA demand letters and conferred with his client about the allegations in them. The DTPA provides that "[e]ach consumer who prevails shall be awarded court costs and reasonable and necessary attorneys' fees." TEX. BUS. & COM. CODE ANN. § 17.50. But the statute makes no other provision for attorney's fees for defending a non-frivolous DTPA claim. The same is true for the Fair Housing Act and Debt Collection Act claims. Because Almeda's summary-judgment evidence shows discrete legal services rendered for some claims for which attorney's fees are unrecoverable, yet does not show segregation of attorney's fees between recoverable and non-recoverable claims, we hold that the trial court erred in awarding $8,000 in attorney's fees for defending against all of the appellants' claims. *See Tony Gullo Motors*, 212 S.W.3d at 313–14. Because Almeda prevailed in its motion for summary judgment on the appellants' breach-of-contract claim, and the lease specifically provided that "the prevailing party may recover from the non-prevailing party attorney's fees," remand is appropriate. *See Silver Lion, Inc. v. Dolphin St., Inc.*, No. 01-07-00370-CV, 2010 WL 2025749, at *18 (Tex. App.—Houston [1st Dist.] May 20, 2010, pet. denied) (mem. op.) (holding that defendant was prevailing party when court entered take-nothing

judgment in his favor); *see also Epps v. Fowler*, 351 S.W.3d 862, 868–69 (Tex. 2011) (holding that defendant is prevailing party for purposes of award of attorney's fees when plaintiff nonsuits case with prejudice). Because the summary-judgment evidence does not conclusively prove Almeda's entitlement to $8,000 in attorney's fees for defending against appellants' claims, we sustain the appellants' eighth issue in part, and we remand this issue to the trial court for further proceedings.

## Conclusion

We reverse the judgment of the trial court to the extent it awarded Almeda $8,000 in attorney's fees for defending against the appellants' claims, and we remand this case to the trial court for further proceedings consistent with this opinion. The judgment of the trial court is otherwise affirmed.

Michael Massengale
Justice

Panel consists of Justices Jennings, Bland, and Massengale.